MODIFIED OPINION[1]

IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 105,183

STATE OF KANSAS,
*Appellee*,

v.

STEVE KELLY MOYER,
*Appellant*.

SYLLABUS BY THE COURT

1.

Where there is a compelling reason to do so, the district court has the discretion to order a victim in a sex crime case to submit to an independent physical examination.

2.

In exercising the discretion to order a victim in a sex crime case to submit to an independent physical examination, the court should consider seven factors, to-wit: (1) the victim's age; (2) the remoteness in time of the alleged criminal incident to the proposed examination; (3) the degree of intrusiveness and humiliation associated with the procedure; (4) the potentially debilitating physical and emotional effects of such examination; (5) the probative value of the examination to the issue before the court;

---

[1]**REPORTER'S NOTE:** Opinion No. 105,183 was modified by the Supreme Court May 17, 2017, to clarify that the Supreme Court is retaining jurisdiction of the case pending further proceedings in the district court.

(6) the evidence already available for the defendant's use; and (7) any other relevant considerations.

3.

An appellate court reviews a district court's denial of a motion for an independent physical examination for an abuse of discretion, and the defendant bears the burden of establishing that the trial court abused its discretion.

4.

Judicial discretion is abused when the judge's action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.

5.

A trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. The determination of whether to order a mistrial is a two-step process:  the trial court must first determine if there was some fundamental failure of the proceeding; and, if so, the trial court must assess whether it is possible to continue the trial without an injustice. A trial court's denial of a motion for mistrial is reviewed under an abuse of discretion standard.

6.

A jury unanimity issue arises where the jurors have heard evidence that the defendant committed multiple acts, any one of which could support a conviction on a single count in the charging document, because a jury must be unanimous as to the particular act that is the basis for a conviction. A trial error occurs where evidence of multiple acts is presented to the jury, unless the State has elected and informed the jury of the specific act upon which it is to rely, or unless the district court has given a unanimity

instruction telling the jury it must agree on the specific act that constitutes the crime in each charge.

7.

In a multiple acts case, a prosecutor's opening statement and closing argument, together with utilizing specific dates in the jury instruction, may act as the functional equivalent of an election by the State of the specific act upon which the jury is to rely to convict the defendant on a single count.

8.

Under the version of K.S.A. 60-455 applicable at the trial in this sexual abuse case, propensity evidence was admissible as long as it was relevant and probative. Where propensity evidence is admissible in a sexual abuse case, the giving of a limiting instruction that restricts the jury's consideration of prior crimes or civil wrongs evidence to specific material facts, other than propensity, does not create reversible error, even if some of the listed material facts are inapplicable under the facts of the case.

9.

Kansas law provides at least three possible bases for litigants to seek recusal of a trial judge: (1) the Kansas Code of Judicial Conduct; (2) statutory provisions, *i.e.*, K.S.A. 20-311d(c); and (3) the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The constitutional basis is the floor, or minimum protection, afforded to litigants against a judge's bias or prejudice.

10.

Under the statutory procedure, after a judge has denied a motion for recusal, an affidavit setting forth the statutory reasons for recusal is required to be filed with the

3

chief judge of the judicial district in which the proceeding is being litigated. The failure to file the requisite affidavit can preclude appellate review of a judge's refusal to recuse.

11.

Under Canon 2, Rule 2.11(A)(2)(d) (2014 Kan. Ct. R. Annot. 767) of the Kansas Code of Judicial Conduct, a judge is required to recuse from a case where the judge knows that a family member within the third degree of relationship is likely to be a material witness in the proceeding. But where the judge's relative was not a witness and the jury was not informed of the relative's involvement in the case, the defendant's right to a fair trial was not abridged by the judge's refusal to recuse.

12.

When the district court conducts a hearing on a defendant's pro se motion for the appointment of substitute counsel at which the defendant is given a meaningful opportunity to present evidence of his or her alleged justifiable dissatisfaction with his or her current counsel, the defendant has received all of the process to which he or she is constitutionally entitled.

13.

The Sixth Amendment to the United States Constitution guarantees that a criminal defendant shall have the right to the effective assistance of counsel, which means that the accused is entitled to competent and loyal counsel and to representation that is free from conflict of interest. The trial judge has the duty to ensure that the defendant receives his or her constitutional right to effective assistance of counsel.

14.

Where the district court in a criminal trial has been put on notice that defense counsel may have a conflict of interest that adversely affects his or her representation of

4

the defendant and/or that defense counsel has provided the defendant with ineffective assistance of counsel, but the district court fails to make a record sufficient for meaningful appellate review, the appropriate remedy is to remand to the district court for further proceedings to fulfill the court's duty to ensure the defendant's Sixth Amendment rights.

Appeal from Sherman District Court; SCOTT SHOWALTER, judge. Original opinion filed October 16, 2015. Modified opinion filed May 17, 2017. Remanded with directions. Court retains jurisdiction.

*Robert A. Anderson, Sr.*, of Robert A. Anderson Law Office, of Ellinwood, argued the cause and was on the brief for appellant.

*Natalie A. Chalmers*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.:  Steve Kelly Moyer directly appeals his five convictions for sex crimes against his minor daughter, J.M. He alleges that (1) the trial court judge was required to recuse; (2) his trial counsel's conflict of interest denied him the right to a fair trial; (3) the district court denied him due process by failing to conduct a meaningful hearing on his pro se pretrial motions for new counsel; (4) the district court erred in denying his motion for an independent physical examination of J.M.; (5) a mistrial was required after the jury mistakenly viewed the unredacted version of the victim's intake interview; (6) the district court erred in failing to provide the jury with a unanimity instruction on four of the counts charged; (7) the district court provided an erroneous limiting instruction on prior crimes or civil wrongs evidence; (8) the prosecutor committed reversible misconduct in closing argument; and (9) cumulative error denied him a fair trial. As an alternative, Moyer asks this court to remand for a *State v. Van*

5

*Cleave*, 239 Kan. 117, 716 P.2d 580 (1986), hearing to determine whether his trial counsel was ineffective, but only if this court holds that none of the alleged errors requires a reversal of his convictions.

As more fully set forth below, we remand the case to the district court for further proceedings to determine whether Moyer was denied his Sixth Amendment right to counsel, either because trial counsel was not constitutionally competent or was not constitutionally conflict-free.

FACTUAL AND PROCEDURAL OVERVIEW

In 1993, Moyer met his future wife, Jessica. On February 18, 1995, they had their first child, J.M. After J.M. was born, the couple married and had four more children, H.M., K.M., S.M., and D.M.

Jessica encouraged Moyer to spend more time with the couple's children because she felt Moyer was not sufficiently involved in their lives. But Jessica was not pleased when Moyer began spending time alone with J.M. behind closed doors in the master bedroom, to the exclusion of the younger children. When J.M. was about 11 years old, Moyer began showering with J.M., until Jessica said that she did not like that. When Jessica asked Moyer about condoms that were missing from her dresser, he responded that the children were probably playing with them.

In August of 2008, the Moyers moved from Denver to Goodland, Kansas. Moyer continued to spend more time with J.M. than the other children. When Jessica inquired about this dynamic, Moyer explained that he wanted to "finish what [he] started with [J.M.]."

On April 5, 2009, J.M. told Jessica that Moyer had been sexually abusing her. J.M. explained that the abuse started when she was 11 years old, after she began menstruating. J.M. gave Jessica several items as evidence of the sexual relationship: two used condoms that J.M. secretly kept from sexual encounters with Moyer in Denver, a recording of a sexual encounter between J.M. and Moyer that occurred in the shed outside of the family's Goodland home, a rag that J.M. used to clean herself after the sexual encounters in Goodland, and a notebook containing an agreement between J.M. and Moyer enumerating a points system Moyer designed detailing the number of points J.M. must obtain in order to complete the sexual relationship with Moyer.

The next day, after Moyer went to work, Jessica and J.M. went to the sheriff's office to report Moyer's abuse. One of the officers set up an intake interview for J.M. with the Western Kansas Child Advocacy Center (hereinafter "intake interview").

The intake interview included a voluminous account of Moyer's sexual abuse of J.M., beginning when she was 11 years old and continuing up to the day she reported it to Jessica. J.M. discussed each of the specific acts that the State ultimately relied upon to convict Moyer, as well as numerous other, uncharged acts of sodomy and sexual intercourse.

The State charged Moyer in a third amended complaint with five counts of sexual abuse against J.M.: aggravated criminal sodomy in violation of K.S.A. 21-3506(a)(1) (sodomy with a child under 14 years of age), aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(1) (sexual intercourse with a child who is 14 or more years of age but less than 16 years of age), and three counts of criminal sodomy in violation of K.S.A. 21-3505(a)(2) (sodomy with a child who is 14 or more years of age but less than 16 years of age). The case proceeded to trial, where J.M.'s testimony was consistent with her intake interview, recounting that the sexual abuse began when she

7

was 11 years old and the family was living in Denver. To begin, Moyer manually touched J.M.'s vagina. The abuse progressed to J.M. performing oral sex on Moyer and then to vaginal and anal intercourse.

When the family moved to Goodland, Moyer took J.M. to a shed by their house and explained a coding system that enumerated the sexual acts J.M. must perform on him. J.M. explained that number 1 was a "[h]and job," number 2 was a "[b]low job," number 3 was "[w]hen he went inside [her] vagina," number 4 was "[w]hen he was on top," and number 5 was "[i]n my butt." J.M. also described a notebook containing an agreement between J.M. and Moyer, which was titled "Computer Software" and the first line of which read: "Start: 30,000 mega bites." J.M. explained that she could earn points for performing sexual acts, but she could lose points for certain actions, and the 30,000 reference was to the number of points she had to earn to complete her sexual relationship with Moyer. Further, when Moyer grounded J.M., she had to earn points through the number coding system and she also received money for reaching a certain number of points.

J.M. explained the terms used in the agreement: "*start & run*" meant when she "went up and talked to him to get the stuff started"; "*auto run*" meant when she "went up to him on [her] own, and then [she] . . . asked what [she] wanted to do to him on [her] own"; "*auto run supreme*" meant "[w]e do it all the way, and don't, like, tell him, like, I don't know what to do next, or something like that"; "*act*" meant when she would "go up and do it" on her own; and "*EWD*" and "*EWOD*" meant "[e]at with drink" and "eat without drink," and both referred to "eating" Moyer's ejaculate.

The agreement also has a "virus" heading, which J.M. testified set forth actions that would take away points. For instance, if she talked or pushed Moyer away while Moyer was touching her, he would take away 100 points. If she used her teeth or vomited

8

during a "blow job," she lost 100 points. Finally, a "[n]o response" meant that she lost 100 points because she did not do anything sexual with Moyer all day. At trial, an expert in handwriting analysis testified it was "highly probable" that Moyer prepared the agreement.

After explaining the agreement, J.M. testified that Moyer sexually abused her in the shed outside of the family's home, in her parent's bedroom, in her sister H.M.'s bedroom, in her bedroom, in the kitchen, and in the living room. This abuse included Moyer touching her breasts, J.M. giving Moyer "blow jobs," Moyer being "on top" of her, and sexual intercourse. Much of J.M.'s testimony was not tied to a certain date.

J.M. also discussed specific events that she was able to link to more definite time frames. On October 2, 2008, when J.M. was 13 years old, she hid an audio recorder in the shed in order to record Moyer's abuse. J.M. testified that on that day, Moyer made J.M. give him a "blow job." There are sounds on the audio recording indicative of sexual acts taking place, and, at one point, Moyer whispered, "try, try, try go further." J.M. asked "what if I did this to [M.M.]," one of her friends from school. Moyer told J.M. to "wait till you get married to do that." J.M. also asked Moyer, "can you feel the cotton in my mouth," and Moyer made an affirmative noise. About a minute later, J.M. asked Moyer, "You know that thing that hangs down . . . when you go up, it makes me [inaudible]." Moyer then told J.M. to whisper things like that. Later in the audio recording, Moyer used the number coding system discussed above and told J.M. what to work on to "make it faster." Moyer also told J.M. "instead of talking to me once a day, the more the merrier." In her intake interview and at trial, J.M. explained "talking" means sexual acts.

The next instances of sexual abuse J.M. tied to a specific date occurred on February 19, 2009. On this date, J.M. was 14 years old. Moyer took her to Walmart to make a list of items she wanted for her birthday. On the way home, Moyer drove to his

9

work and parked the minivan behind his work truck. In the back of the minivan, J.M. gave Moyer two "blow jobs" and Moyer had sex with her. J.M. said Moyer did not ejaculate that day. The State submitted J.M.'s birthday list into evidence. The list indicated the points J.M. earned that day.

J.M. also testified about two specific instances of abuse that occurred in April of 2009. The first happened when Moyer licked her vagina in the family's bathroom. The second, Moyer's last act of sexual abuse, occurred in her parents' bedroom when J.M. "touch[ed] [Moyer] on the penis and then g[a]ve him a blow job."

Sexual Assault Nurse Examiner (SANE) Tricia Carney testified regarding the physical examination she performed on J.M., explaining that the vaginal area is treated like a clock for purposes of identifying the location of injuries. Carney noticed J.M. had thinning to the 6 o'clock area of her hymen and what appeared to be a healed abnormality at the 8 o'clock area. Carney explained that her education and training have taught her that injuries from the 3 to 9 o'clock area are significant for mounting injuries. Mounting injuries occur when the penis has direct first contact with the vaginal area during intercourse. Carney testified that the location of J.M.'s injuries was consistent with the sexual history J.M. provided.

The Kansas Bureau of Investigation (KBI) conducted a sexual assault investigation of the Moyer's home and minivan. KBI forensic scientist James Newman's role in the investigation was to look for seminal fluid. Newman did not find seminal fluid in the house, shed, or minivan. Newman noted that he did not look for seminal fluid on the master bedroom bedding.

Newman also conducted deoxyribonucleic acid (DNA) testing on one of the condoms and the rag J.M. saved from her sexual encounters with Moyer. Newman did

not test the other condom because it did not contain seminal fluid. Newman compared the DNA profile on a sample cut from the rag and swabs from the tested condom to known DNA samples from Jessica, J.M., and Moyer. The DNA profile on the rag and on the inside of the tested condom matched the known sample for Moyer. On the swab from the outside of the condom, Newman found a partial DNA profile consistent with J.M.'s profile. The swab from the outside of the condom also contained DNA from another individual, but the profile did not contain enough information to compare it to the known profiles. None of the DNA profiles from the evidence were consistent with Jessica's DNA.

Obstetrician-gynecologist Dr. Merle J. Hodges testified in Moyer's defense. Hodges reviewed Carney's report and the photographs associated with J.M.'s physical examination. He testified that J.M. had damage to her hymen and there was "no doubt she had penetration of her vagina." But he explained that injuries to the hymen can be caused by nonsexual means such as falling off a bicycle, doing the splits, first-time tampon use, or masturbation.

Unlike Carney, Hodges did not see hymenal thinning at 6 o'clock or damage at 8 o'clock. He noted a tear on the hymenal ring at 11 o'clock that is unusual for someone of J.M.'s age whose vagina has never been penetrated. He testified he could not know whether the tear fit the description of events in this case. He explained he would expect to see more gaping of the hymenal opening and a less intact hymen for a 14-year-old person who has had fairly vigorous intercourse.

Moyer also presented forensic scientist Stephanie Beine as an expert. Beine reviewed the KBI findings and believed the results were correct. However, she pointed out that it was unusual that the KBI did not locate any seminal evidence in the house or minivan. She also found it unusual that J.M.'s DNA was not found on the rag.

11

Additionally, she noted that DNA testing cannot confirm whether the DNA profiles on the condom were deposited as part of the same incident or as part of unrelated incidents. Further, she pointed out the DNA on the outside of the condom did not necessarily come from a bodily fluid.

Beine opined that Moyer's other daughters should have been tested. She pointed out that only a partial DNA profile, 9 or 13 locations, was obtained from the outside of the condom. She testified that unrelated persons can share DNA across 9 or up to 13 locations and related persons would share even more common locations.

Moyer testified on his own behalf, denying that he had sexually abused J.M. He related that Jessica told him he needed to spend more time with J.M. and when he did, Jessica used it against him. Jessica threatened to divorce him because he was spending too much time with J.M. and not enough time with his other children. He further explained that J.M.'s abuse allegations came after a particularly contentious day in the Moyer family, during which the family had to tow their car and Moyer became angry with his family for not helping him during the process. Moyer had also grounded the children from the family's computer.

Moyer admitted drafting the agreement that allegedly contained a points system for sexual acts. But he denied that the document was related to sex. Instead, he created the document to explain to J.M. how a computer works.

Moyer also confirmed that the voices in the audio recording from the shed are his and J.M.'s. However, he denied that sexual abuse occurred in the shed. Instead, he explained that J.M. was doing her math homework and the references to 1 through 5 were about that homework.

The jury convicted Moyer as charged. The district court denied Moyer's motion to depart from the mandatory minimum Jessica's Law sentence on count 1. The district court imposed a hard 25 sentence for count 1 and an additional 118 months' imprisonment for counts 2-5.

Moyer's appeal was docketed on November 17, 2010. Therefore, this court has jurisdiction over his appeal under K.S.A. 22-3601(b)(1) (life sentenced imposed pursuant to K.S.A. 21-4643). *Cf.* L. 2011, ch. 100, sec. 9(b)(3), effective July 1, 2011 (excepting Jessica's Law cases from direct appeal to the Supreme Court). We take the liberty of considering Moyer's issues in a different order than he presents them in his brief.

INDEPENDENT PHYSICAL EXAMINATION OF VICTIM

Three months after the complaint was filed, the defense filed a motion for an independent forensic medical examination of J.M. The State responded that J.M. had already undergone a physical examination and that a second exam was unwarranted. In an amended motion, the defense argued that the State's examination was performed by a registered nurse practitioner and that the defendant was entitled to a forensic examination by a medical doctor.

The district court conducted a hearing on the motion, at which it utilized the factors set forth in *State v. McIntosh*, 274 Kan. 939, 953, 58 P.3d 716 (2002), to assist in the determination of whether the defendant has established a compelling reason for an independent physical examination. In denying Moyer's motion, the district judge announced: "I do not believe, based upon the testimony that has been presented to me today, or the statements at least made by the parties, that a forensics exam is warranted, and I will deny the defense's motion."

13

But the district court also informed the parties that it would reconsider its ruling if Moyer's expert could give any reasons why a second or independent examination was necessary. The record does not indicate that Moyer's expert opined that an independent examination was necessary or that Moyer requested reconsideration of the court's ruling. Nevertheless, Moyer challenges the district court's assessment of the *McIntosh* factors.

*Standard of Review*

This court reviews a district court's denial of a motion for an independent physical examination for an abuse of discretion. *McIntosh*, 274 Kan. at 953. The defendant bears the burden of proving the trial court abused its discretion. 274 Kan. at 955. Judicial discretion is abused when the action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

*Analysis*

In *McIntosh*, this court held that "where there is a *compelling* reason, the district court has the discretion to order a victim in a sex crime case to submit to an independent physical examination." (Emphasis added.) 274 Kan. at 952. The court set out seven factors to assist a court in determining whether a defendant has established the requisite compelling reason, to-wit:

> "(1) the victim's age; (2) the remoteness in time of the alleged criminal incident to the proposed examination; (3) the degree of intrusiveness and humiliation associated with the procedure; (4) the potentially debilitating physical and emotional effects of such examination; (5) the probative value of the examination to the issue before the court; (6) the evidence already available for the defendant's use; and (7) any other relevant considerations." 274 Kan. at 955.

Moyer does not contend that the district court committed an error of law when it applied the *McIntosh* factors, and he does not make any showing that the district court based its decision upon an error of fact. Consequently, to prevail, Moyer must convince us that the district court abused its discretion by being arbitrary, fanciful, or unreasonable. But the court's methodical use of established protocol belies the notion that it was arbitrary or fanciful. Therefore, the only remaining avenue available to Moyer is to convince us that the district court was unreasonable, *i.e.*, that no reasonable person would have found that there was no compelling reason to order an independent physical examination of J.M. after considering and applying the *McIntosh* factors. He fails to carry that burden.

For instance, under the first factor, the district court determined that J.M.'s age of 14 years old was "[y]oung enough that an exam, a trial and testimony will have a detrimental effect." The consideration of the age factor also dovetailed into the other factors of the degree of intrusiveness and the debilitating effects of the examination, which the district court found also counseled against ordering an independent physical examination. Moyer argues that J.M. was older than the 11-year-old victim in *McIntosh*; that J.M.'s videotaped interview revealed that she was a "mature and self-possessed girl"; and that the district court was wrong to disagree with the defense assessment of the victim as a "strong" individual who could endure the testing without lasting effect.

Essentially, Moyer would have us reweigh the evidence and make our own factual findings that contradict the trial court's assessment of these factors. But that is not our role here. It matters not a whit whether an appellate jurist might have made a different decision. "While others might disagree with the trial judge, if reasonable persons *could* agree [with the trial judge] it cannot be said that the trial judge abused [his or her] discretion." (Emphasis added.) *State v. Lowrance*, 298 Kan. 274, 295, 312 P.3d 328

15

(2013). The district court's assessment of the factors relating to the potential impact upon the victim of ordering another examination were well within the bounds of reasonable debate, so that we can find no abuse of discretion there.

More importantly, however, Moyer failed to proffer any compelling evidentiary reason for an independent examination. As the State explained to the district court, any acute injuries would have been healed long before the time of the proposed independent examination and the SANE nurse had obtained over 30 colposcope slides of the victim's vagina and anus, which any defense expert could use to opine on whether the victim's allegations were supported by the physical evidence. Even then, the district court exercised its discretion under the probative value factor with extreme caution, specifically advising the defense that the matter was open for reconsideration if its expert could provide a valid reason that an independent examination was necessary. Pointedly, neither an expert's reason nor a defense reconsideration request ever materialized. Most reasonable persons under that scenario would agree with the district court's determination that the defendant had failed to show a compelling reason for an independent physical examination of the victim.

We do note, however, that Moyer also complains about the prosecutor's conduct on cross-examination. The State fervently argued against another physical examination of the victim on the basis that it was unnecessary because the defense's expert could use the existing evidence to form an opinion as to whether the victim suffered injuries consistent with her allegations. Then, at trial, the prosecutor endeavored to impeach the defense's doctor expert on the basis that the expert had not conducted his own physical examination of the victim. While such a trial tactic might provide a ground for another type of complaint, it does not render the trial court's pretrial determination that there was no compelling reason to order an independent physical examination of the victim an abuse of discretion.

16

ERRONEOUS SHOWING OF VICTIM'S UNREDACTED INTAKE INTERVIEW

Prior to opening statements, the district court ruled that the intake interview of J.M. would be admissible at trial if certain portions were redacted per the parties' agreement. Then, during the State's case-in-chief, the court admitted into evidence the redacted version of the intake interview, albeit the record does not indicate that it was played for the jury at that time. While admitting the redacted interview, the court admonished the jury not to concern itself "with the fact that certain portions of the recording have been redacted, nor should you draw any inferences, either for or against the Defendant or the State, because of this."

While the original unredacted version of the intake interview was not officially admitted into evidence, the court granted the State's request to have an unredacted version follow the record for appellate purposes. That request by the State and subsequent decision by the court provided the logistics for the evidentiary faux pas that followed: During jury deliberations, the court received notice that the jury was watching the unredacted intake interview, *i.e.*, the jurors were considering evidence that the trial judge had ruled that they could not consider because it was prejudicial to the defendant.

As soon as the court became aware that the jury was watching the original unadmitted recording, the trial judge notified both parties and went into the jury room to order the jury to turn off the DVD. The jurors told the judge that they had reached the point in the videotape where there was a break. The parties agreed that the court would give the jurors the following admonition:

> "You have inadvertently viewed an unredacted version of the intake interview of
> Kelly Robbins. You're admonished to not consider what you have already viewed, but
> that you must consider [the redacted version] in its place. . . . You should watch the

17

redacted version up to the point you stopped watching, however, you are welcome to watch beyond that point.

"Mr. Pianalto will be coming in and setting up the equipment necessary to view this. Please do not deliberate while Mr. Pianalto is in the room, nor can he be asked or answer any questions."

Burton Pianalto was the law enforcement investigator on the case and the person who had custody of the recordings. Moyer argues that, notwithstanding the trial judge's attempt to cure the error with an admonition, the jury's viewing of excluded evidence was reversible error that mandated the granting of his mistrial motion. The State counters that the error was harmless, because the prejudicial evidence of which the defense complains was similar to other admitted evidence that the jury heard.

*Standard of Review*

"On appeal, a trial court's decision denying a motion for mistrial is reviewed under an abuse of discretion standard. Judicial discretion is abused if the decision (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *State v. Waller*, 299 Kan. 707, 722, 328 P.3d 1111 (2014) (citing *State v. Harris*, 293 Kan. 798, 814, 269 P.3d 820 [2012]).

*Analysis*

Recently, this court articulated the law applicable to a trial court's decision as to whether to declare a mistrial and discussed the application of the abuse of discretion standard to the trial court's decision:

"Under K.S.A. 22-3423(1)(c), a trial court may declare a mistrial if there was prejudicial conduct either inside or outside the courtroom that makes it impossible for the trial to proceed without injustice to either the defendant or the prosecution. This statute

18

creates a two-step process. First, the trial court must determine if there was some fundamental failure of the proceeding. If so, the trial court moves to the second step and assesses whether it is possible to continue without an injustice. In other words, the trial court must decide if the prejudicial conduct's damaging effect can be removed or mitigated by an admonition, jury instruction, or other action. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012); see *State v. Race*, 293 Kan. 69, 80, 259 P.3d 707 (2011).

"In *Ward*, our court articulated this standard by dividing the appellate court's abuse of discretion inquiry into two parts, asking: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice? 292 Kan. at 551." *Waller*, 299 Kan. at 725-26.

Wisely, the State concedes that we need not spend any time ruminating on the first step. Moyer asserts that it was the State's agent, Pianalto, who was responsible for the wrong DVD being sent to the jury room. One would be hard-pressed to conjure up a more fundamental failure in the proceedings than having the State give the jury judicially excluded evidence and the jury using that prohibited evidence as part of its deliberations. *Cf. State v. Price*, 24 Kan. App. 2d 580, 584, 948 P.2d 1145 (1997) (court admitted redacted police report; unredacted version sent to jury room for deliberations "obviously" mistake), *rev. denied* 263 Kan. 890 (1998). Certainly, reasonable people would agree with the district court's determination that the jury viewing the unredacted intake interview recording was a fundamental failure in the proceedings. In other words, we hold that the district court did not abuse its discretion on the first step of the analysis.

Before the district court, the defense argued that three segments of the unredacted forensic interview heard by the jury were highly prejudicial to the defense. The first segment was J.M.'s description of an event where Moyer was physically abusive to H.M.

19

and Jessica. Specifically, J.M. explained that event as Moyer grabbing H.M. by the hair, throwing her down, and throwing a pop can at her, after which he put his hand on Jessica's arm. In the second challenged segment, J.M. described Moyer threatening to kill Jessica and the other children; Moyer getting angry at the other children and calling them names; and Moyer threatening to "get rid of" J.M. and one of her sisters, which J.M. explained meant finding the children new parents. The third segment involved Moyer walking around the house naked; Moyer asking his daughters to walk around without shirts; and Moyer asking H.M. and J.M. to kiss him while they were not wearing shirts. This segment also included J.M.'s statement that her sisters had told her that Moyer had not done anything sexual to them. The district court opined that the trial could continue with the jury admonition without injustice.

We have an advantage over the district court in analyzing the second step—the damaging effect of the fundamental failure in the proceedings—because we can look at the entire record of the trial, including what transpired after the district court denied the mistrial motion. *Waller*, 299 Kan. at 726 ("Appellate courts reviewing the second part for an injustice may take a broader view than the trial court because appellate courts may examine the entire record."). From that entire record, we must assess whether the harm or prejudice rose to the level of causing injustice. *Cf. United States v. Jaramillo*, 98 F.3d 521, 525 (10th Cir. 1996) (in determining whether new trial warranted, court looks "to whether the defendant was harmed or prejudiced by the jury seeing the evidence"). In this case, that review reveals that other evidence that was admitted by the district court created the same type of prejudicial negative inferences that Moyer attributes to the erroneously admitted evidence. In other words, the prejudicial effect of the challenged evidence was ameliorated by the fact that there was properly admitted inculpatory evidence of the same ilk.

For instance, similar to the threats of physical harm that were supposed to be redacted, there was evidence admitted in which J.M. related that Moyer, at different times, had threatened to hurt Jessica and/or to kill J.M., if she told anyone about the sexual abuse. Moreover, the evidence of the violent event with H.M. and Jessica was no more damning than the admitted inculpatory evidence of the numerous uncharged sexually violent acts of sodomy and sexual intercourse, beginning when J.M. was 11 years old. J.M. related one such event occurring in Denver in which Moyer made her get on her knees "like a dog" and he put his penis in her "butt." Given the tenor of the evidence as a whole, the trial judge's determinations that the jury would heed his directive to disregard the improperly submitted evidence and that the jury was still "in an appropriate position to make a decision based solely upon [the] evidence" were reasonable findings, *i.e.*, not an abuse of discretion.

UNANIMITY INSTRUCTIONS

Pursuant to the defense's request, the district court instructed the jury that it had to be unanimous on the particular act that constituted the crime of aggravated criminal sodomy, as charged in Count 1 of the charging document. But the court did not give a unanimity instruction on the other four counts: criminal sodomy in count 2; aggravated indecent liberties with a child in count 3; criminal sodomy in count 4; and criminal sodomy in count 5. Moyer makes the contradictory assertions that his trial attorney "argued for an unanimity instruction on each of the five counts" but that the clearly erroneous standard is applicable on this issue. See *State v. Williams*, 295 Kan. 506, Syl. ¶ 5, 286 P.3d 195 (2012) (clearly erroneous reversibility standard applicable where instruction not requested). Nevertheless, it is clear from the record that defense counsel made the trial judge aware of the unanimity issue so as to avoid the clearly erroneous burden on appeal.

21

*Standard of Review*

The threshold question is whether the jurors heard evidence of multiple acts, each of which could have supported conviction on each respective count. *State v. King*, 299 Kan. 372, Syl. ¶ 1, 323 P.3d 1277 (2014). That is a question of law subject to unlimited review. *State v. Santos-Vega*, 299 Kan. 11, 18, 321 P.3d 1 (2014) (citing *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 [2007]).

If the case presents a multiple acts scenario, the next question is whether there was error. "'To avoid error, the State must have informed the jury which act to rely upon or the district court must have instructed the jury to agree on the specific act for each charge.'" *State v. Castleberry*, 301 Kan. 170, 185, 339 P.3d 795 (2014).

Then, if a failure to elect or instruct created error, this court "'determines whether the error was reversible or harmless.'" *Castleberry*, 301 Kan. at 186. Unanimity is required by statute in Kansas; it is not a constitutional right. See *State v. Charles*, 298 Kan. 993, 997-98, 318 P.3d 997 (2014). Accordingly, the nonconstitutional harmless error standard applies to the failure to elect or instruct on unanimity, which standard requires that there be no reasonable probability that the error affected the outcome of the trial in light of the entire record. See *Ward*, 292 Kan. at 569.

*Analysis*

As noted, the district court gave a unanimity instruction on count 1, resulting in no error, even if there were multiple acts of aggravated criminal sodomy. But the court failed to give a unanimity instruction on the four other counts, requiring us to determine the existence of multiple acts. If multiple acts exist, then we must determine whether the State effectively elected the act that the jury had to consider. Finally, the absence of an effective election moves us to a harmless error analysis.

*Did the jury hear evidence of multiple acts on counts 2-5?*

We have stated the principles for determining multiple acts as follows:

> "This court has determined that acts are multiple acts if they are factually separate and distinct. Further, "'[i]ncidents are factually separate when independent criminal acts have occurred at different times or when a later criminal act is motivated by a 'fresh impulse.'"' *State v. Kesselring*, 279 Kan. 671, 683, 112 P.3d 175 (2005) (quoting *State v. Hill*, 271 Kan. 929, 939, 26 P.3d 1267 [2001]). In addition, this court has identified other factors for determining if there is unitary conduct in a multiple acts case. These factors include: '(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.' *State v. Schoonover*, 281 Kan. 453, 507, 133 P.3d 48 (2006)." *State v. Colston*, 290 Kan. 952, 962, 235 P.3d 1234 (2010).

In counts 2, 3, and 5, the jury instruction limited the time frame at issue to "on or about" a date certain. Count 4 limited the time frame at issue to a span of March 23, 2009, to April 2, 2009. Normally, "'on or about' language in the . . . jury instruction is not problematic," unless two or more instances of the crime occurred on two or more separate dates. *Colston*, 290 Kan. at 963. Here, notwithstanding the limitation on the dates, many of the events that J.M. discussed as occurring in Goodland did not reference exact dates.

Three of the counts—2, 4, and 5—charged the crime of criminal sodomy. The jury was provided the following sodomy definition: "Sodomy means: (1) oral contact or oral penetration of the female genitalia or oral contact of the male genitalia." In J.M.'s intake interview, she discussed at least 12 instances of conduct that occurred in Goodland which would appear to meet this definition. Likewise, count 3 instructed the jury that it had to find that Moyer had sexual intercourse with J.M. while she was more than 14 years of age

23

but less than 16 years of age in order to convict Moyer of aggravated indecent liberties with a child. In her intake interview, J.M. stated that Moyer's penis had been in her crotch five or six times. In short, the jury heard J.M. describe multiple acts which could have formed the basis for convicting Moyer on the challenged counts.

*Election by the State*

The State argues that it elected which act it was relying upon to support each of the counts 2 through 5. For the most part, the record confirms the State's contention. In the State's opening statement, the prosecutor described the events that the State would prove to support each of the counts. Likewise, in closing argument, the prosecutor set out the State's election as follows:

> "[T]here is so much sex here, all of it's not before you for precise charging, but the finite dates and the finite sex acts that she remembers with clarity, those are the ones that are before you.
>
> . . . .
>
> "The elements. These are the things that must be established beyond a reasonable doubt in order for you to return verdicts of guilty. . . .
>
> . . . .
>
> "Count 2. Criminal sodomy. . . . February 19th of 2009. . . .
>
> "The State's theory for counts 2 and 3 is the van trip to Wal-Mart, and then he takes that van and parks it behind his grain truck at his employment. . . . [T]here's two separate sex acts. Two separate charges in the van that day. Her performing oral sex on him, and then the next count is the intercourse. . . .
>
> "Why is it charged one is criminal sodomy and one is aggravated indecent liberties? Because . . . the elements are different. Oral sex is different than penal vaginal intercourse.
>
> "The elements of Count 4, criminal sodomy. That he engaged in sodomy with her, and this is the bathroom incident where he performs oral sex on her vagina . . . on or about March 23rd of '09 to April 2nd of '09 . . . .

" . . . How do you develop beyond a reasonable doubt that it happened then? Because she tells you the thing in the bathroom on the toilet, it happened about three weeks—three weeks before I told. And that's where that time frame comes from that takes you into March.

. . . .

"Count 5. Elements. This is the last time that she had to take his penis in her mouth. It's Friday night, the Friday before she told her mom—

. . . .

". . . [O]n that Sunday, in Mom and Dad's bedroom. . . .That is the last time that she had to do this."

We have previously considered a prosecutor's opening statement and closing argument as constituting the functional equivalent of an election by the State. See *State v. Dickson*, 275 Kan. 683, 696, 69 P.3d 549 (2003) (holding that there was no multiple acts error because State made the functional equivalent of an election when, in both opening statement and closing argument, the prosecutor informed the jury which single incident it was relying upon). But *cf. Colston*, 290 Kan. at 969 (rejecting election argument because the prosecutor did not tell the jury "it could not consider evidence of other acts supporting the same charge or that it must agree on the same underlying criminal act"). Here, the State attempted to prosecute only those sexual acts for which J.M. could identify a date of occurrence and then the prosecutor further focused the jurors' attention on the specific acts by describing where and how they occurred. With the exception of the count 2 criminal sodomy charge, discussed below, we can discern no room for jury confusion as to the particular sexual act for which the State was prosecuting Moyer.

With respect to the count 2 sodomy charge, the State has candidly admitted that its election may not have completely solved the multiplicity problem. The instruction on that count read as follows:

"The defendant is charged in Count 2 with criminal sodomy. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That the defendant engaged in sodomy with a child who was 14 or more years of age but less than 16 years of age, that being J.M. (D.O.B. 2/18/1995); and

"2. That this act occurred on or about the 19th day of February, 2009, in Sherman County, Kansas."

The prosecutor described this act as being the oral sex J.M. performed on Moyer during the van trip to Walmart. But J.M.'s testimony about the February 19, 2009, incident did not clearly establish whether she performed one or two acts of felatio during the Walmart trip. She first testified that she earned points for doing "two 2s," explaining that "2s" were "blow jobs." Later, she testified "I had to give him *a* blow job." (Emphasis added.) In her videotaped intake interview, J.M. only discussed performing one act of oral sodomy on Moyer in the minivan. In short, the jury heard evidence that may have been confusing as to the specific act that the State had elected.

The State does not argue that these two acts of sodomy were unitary conduct, which might well have been the case. See *State v. Schoonover*, 281 Kan. 453, 507, 133 P.3d 48 (2006) (discussing factors to determine unitary conduct). Instead, the State contends that any unanimity error that arose in this case must be deemed harmless. We agree.

As the State points out, Moyer asserted a general denial defense to all of the alleged sexual acts. Previously, we have been less inclined to reverse a multiple acts error where the defendant presented a unified defense, *e.g.*, a general denial. See *State v. De La Torre*, 300 Kan. 591, 599, 331 P.3d 815, *cert. denied* 135 S. Ct. 728 (2014). Nevertheless, we have discouraged prosecutors from relying upon the appellate court to find harmless error in multiple acts cases, declaring that "the better solution is for the

State to elect or for the trial court to instruct on unanimity in multiple acts cases—as we have clearly required since at least 2001." *Voyles*, 284 Kan. at 255.

The State argues that our facts are similar to those in *State v. Foster*, 290 Kan. 696, 233 P.3d 265 (2010), where we found that the State's failure to elect which of two separate rapes on which it was relying was not clearly erroneous. We do note, however, that part of the rationale in *Foster* was the consistency of the victim's testimony about the rapes. 290 Kan. at 716. Although J.M. was consistent about what happened, her testimony was ambivalent about the number of times it happened in the van on the Walmart trip. Nevertheless, we are firmly convinced that, viewing the entire record—including Moyer's general denial—there is no reasonable probability that the result would have been different if the jury had been instructed that it had to be unanimous as to the specific act of fellatio that constituted the criminal sodomy on that date in the minivan on the Walmart trip. In other words, the error created by the State's ineffective election was harmless.

K.S.A. 60-455 LIMITING INSTRUCTION

Prior to trial, the State moved to admit "evidence of a prior act of sexual misconduct, pursuant to the recently amended K.S.A. 60-455(d)." Specifically, the State wanted to admit evidence of Moyer's prior sexual abuse of J.M. while the family lived in Colorado, evidence of J.M.'s actions in saving a condom used during one of the acts of abuse by Moyer in Colorado, and evidence of the DNA found on the Colorado condom. The statutory reference was to the 2009 amendments to K.S.A. 60-455, which were effective April 30, 2009, *i.e.*, after the crimes were committed but before Moyer's trial. See L. 2009, ch. 103, secs. 12, 15. The relevant amended subsection reads as follows:

"(d) Except as provided in K.S.A. 60-445, and amendments thereto, in a criminal action in which the defendant is accused of a sex offense under articles 34, 35 or 36 of chapter 21 of the Kansas Statutes Annotated, . . . and amendments thereto, evidence of the defendant's commission of another act or offense of sexual misconduct is admissible, and may be considered for its bearing on any matter to which it is relevant and probative." K.S.A. 2014 Supp. 60-455.

The district court first determined that the amendments were procedural in nature and, therefore, their provisions could be applied in Moyer's trial. Moyer does not challenge this ruling on appeal, and such a challenge would be unavailing. See *State v. Prine*, 297 Kan. 460, 472, 303 P.3d 662 (2013) (application of 2009 amended version of K.S.A. 60-455 to crimes alleged to have been committed prior to the amendments not a violation of Ex Post Facto Clause).

With respect to the admissibility of the evidence, the court ruled that the prior sexual conduct was relevant and that it was not unduly prejudicial. The district court's written findings specifically stated that "[t]he proffered evidence is relevant to show intent, plan, identity, the relationship of the parties and a continuing course of conduct," and that "[t]he probative value of this evidence is prejudicial, but on the facts of this case, not unduly prejudicial. The probative value outweighs the prejudicial effect." The district court ordered the State to draft an appropriate limiting instruction reflecting the court's findings. It is that limiting instruction which Moyer's brief purports to challenge on appeal.

*Standard of Review*

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to

28

determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

If the appellant failed to properly object to the instruction in the trial court, the standard on appeal is whether the instruction was clearly erroneous. *Williams*, 295 Kan. at 511-12.

*Analysis*

Initially, there is some question as to whether Moyer preserved the instruction challenge that he now makes. He declares that the defense partially objected to the limiting instruction, but he admits that the objection did not include all of the grounds the district court included in the instruction. Nevertheless, the standard of review will not determine the outcome in this case.

Moyer's claim is premised on his assertion that "K.S.A. 60-455 only states one purpose for which prior bad acts evidence can never be admitted:  to establish a defendant's disposition to commit the crime, in other words propensity evidence." Then he declares that "'relationship of the parties' and 'course of conduct' are merely propensity evidence in sheep's clothing." But this court has expressly rejected the argument that propensity evidence remains inadmissible in sexual abuse cases. See *State v. Bowen*, 299 Kan. 339, 349, 323 P.3d 853 (2014) ("Bowen's claim that K.S.A. 2013 Supp. 60-455[d] is subject to the limitation on admission of propensity evidence in subsection [a] has been expressly rejected."). "Under the 2009 version of K.S.A. 60-455, propensity evidence is

29

admissible in sexual abuse cases as long as it is 'relevant and probative.'" *State v. Dean*, 298 Kan. 1023, 1032, 324 P.3d 1023 (2014). In other words, Moyer's complaint that the limiting instruction had the effect of advising the jury it could consider his propensity for sexually abusing J.M. simply does not assert an error. Moreover, Moyer does not argue that evidence of Moyer's past sexual history with J.M. is not relevant and probative. To the contrary, his brief complains that this evidence shows his propensity to molest J.M.

In the *Prine* decision cited above, we opined that the 2009 amended subsection (d) of K.S.A. 60-455 rendered obsolete the limiting instruction in a sex crime prosecution, noting that

> "there remains no reason to tell jurors to ignore the bearing prior sexual misconduct may have on the defendant's propensity to commit the charged crime or crimes. If other sex crimes or civil wrongs are relevant, *i.e.*, material and probative of propensity, the jury may consider them for that. We no longer need the workaround the limiting instruction hoped to ensure." 297 Kan. at 479.

Therefore, by including in the limiting instruction specific purposes gleaned from subsections (a) and (b) of K.S.A. 2009 Supp. 60-455, the trial court in this instance "essentially granted [Moyer] more protection than the law afforded him," under subsection (d). See *Dean*, 298 Kan. at 1035. Accordingly, to the extent that the district court included in the limiting instruction any material facts that might not have been applicable or disputed, the error was completely harmless and Moyer is entitled to no relief.

PROSECUTORIAL MISCONDUCT

Moyer argues that the prosecutor committed reversible misconduct in closing argument by making the following statement: "There's so much physical corroborating

evidence here, but there is always in these cases." His complaint is two-fold: the first part of the statement was the prosecutor's personal opinion on the strength of the evidence, and the second portion stated facts not in the record.

*Standard of Review*

"A claim of prosecutorial misconduct based on comments made during closing argument will be reviewed on appeal, even where there was no contemporaneous objection. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). Such review involves a two-step process. First, we decide whether the comments were outside the wide latitude that a prosecutor is allowed in discussing the evidence. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012). If the comments were improper and constituted misconduct, we then determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. 294 Kan. at 856. Under this second step, we consider three factors. First, was the misconduct gross and flagrant? Second, was the misconduct motivated by ill will? Third, was the evidence of such a direct and overwhelming nature that the misconduct would have had little weight in the mind of a juror? See *State v. Bridges*, 297 Kan. 989, Syl. ¶ 15, 306 P.3d 244 (2013). None of the three factors is individually controlling. *State v. Adams*, 292 Kan. 60, 66, 253 P.3d 5 (2011).

"Finally, in considering the third factor, this court requires that the prosecutorial misconduct error meets the 'dual standard' of both constitutional and statutory harmlessness in order to uphold a conviction. *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004). The State bears the burden of demonstrating harmlessness under both standards. However, if the State meets the higher constitutional harmless error standard, the State necessarily meets the lower statutory standard under K.S.A. 60-261. See *Bridges*, 297 Kan. at 1012-13, 1015. The constitutional, or *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), harmless error standard provides that

"'error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the

31

outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (citing *Chapman*, 386 U.S. 18)." *State v. Brown*, 298 Kan. 1040, 1050-51, 318 P.3d 1005 (2014).

*Analysis*

To support his argument that the prosecutor impermissibly offered a personal opinion on the quality of the State's evidence, Moyer points to cases in which we have said that prosecutors cannot comment on the *credibility of witnesses* during closing argument. See, *e.g.*, *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011). He points out that comments of this type are prohibited "because such comments are 'unsworn, unchecked testimony, *not commentary on the evidence of the case*.'" (Emphasis added.) *Duong*, 292 Kan. at 830 (quoting *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 [2000]).

Thus, Moyer's own cited caselaw establishes the flaw in his argument, *i.e.*, a prosecutor's statements about the evidence presented in the case is different than a prosecutor's personal opinion on a witness' credibility. Statements based on evidence, even when discussing the credibility of witnesses, do not constitute prosecutorial misconduct. See *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011) ("The prosecutor's five references to M.C.T.'s credibility trouble us less. Each was accompanied by a discussion of the evidence presented at trial, and this all-important context persuades us that the prosecutor was merely asking the jury to draw permissible inferences from that evidence."). In short, it is not misconduct for a prosecutor to comment on the amount of physical evidence presented in a case. See *State v. Peppers*, 294 Kan. 377, 394, 276 P.3d 148 (2012) ("Prosecutors are prohibited from arguing facts not in evidence, but they are given wide latitude during closing argument to argue reasonable inferences based on

the evidence presented at trial."). Consequently, we need go no further on that part of the statement.

The second part of the argument is more problematic in that, as the State concedes, it stated a fact that was not in the record, *i.e.*, that there is always much physical corroborating evidence in these cases. This court has "consistently found prosecutorial misconduct when a prosecutor argues facts that are not in evidence." *State v. Akins*, 298 Kan. 592, 605, 315 P.3d 868 (2014). Accordingly, we must move to the second step of determining whether the erroneous comment prejudiced the jury against the defendant and denied him a fair trial.

Regarding the first factor—whether the conduct was gross and flagrant—we have opined that "arguing facts not in evidence [is] gross and flagrant because 'every prosecutor should know that he or she cannot make arguments for which there is no evidentiary support.'" *Brown*, 298 Kan. at 1052 (quoting *State v. Lowrance*, 298 Kan. 274, 284, 312 P.3d 328 [2013]). The State does not convince us that this case presents an exception to that rule.

Nevertheless, under the second factor—whether the comment was motivated by ill will—we observe that "the statement does not appear to have been deliberate, repeated, or in apparent indifference to a court's ruling." *Brown*, 298 Kan. at 1052. To the contrary, as the State points out, this comment appears to undervalue the large amount of physical evidence presented in this case. In other words, the comment was more detrimental to the State than the defense by saying that the large amount of evidence was not extraordinarily compelling in this case because it was typical.

Finally, under the third factor, Moyer argues that the evidence against him was not overwhelming, while the State contends that the physical evidence corroborating J.M.'s

33

testimony constituted overwhelming evidence. Although not absolutely controlling, Moyer's argument suffers from a misstatement of the testimony regarding the DNA analysis performed on the condom. Moyer incorrectly argues that the DNA profile on the outside of the tested condom was not tested against Jessica's DNA. The forensic scientist compared the partial DNA profile on the outside of the condom to the known DNA sample from Jessica and determined that Jessica's DNA profile was not found. Moreover, the evidence included J.M.'s intake interview, J.M.'s trial testimony, the DNA evidence presented, the evidence of J.M.'s sexual trauma, and, perhaps most compelling, the audio recording from the shed.

In sum, when the prosecutor's isolated comment is considered against the record as a whole, we hold that there was no reasonable possibility that the erroneous statement contributed to the guilty verdict. Moyer is entitled to no relief.

TRIAL JUDGE RECUSAL

The assigned trial judge's son, Officer Jason Showalter, was involved in the case. He accompanied the principal investigator, Detective Burton Pianalto, to effect Moyer's arrest. Originally, the State endorsed Officer Showalter as a witness. Moyer moved for the recusal of Judge Showalter, arguing that his son's involvement in the arrest and his witness status "would give an impression to the jury of favoritism or more significant weight" to his testimony.

The State responded that it did not intend to call Officer Showalter in its case-in-chief and, therefore, the officer would only be called if the defense thought his testimony was necessary, which the State did not anticipate. The district court resolved the potential conflict by altering the evidence in the case, *i.e.*, the court formally struck Officer Showalter as a witness and denied Moyer's motion. Later, the district court granted a

34

defense motion in limine precluding any mention of Officer Showalter's name during the trial.

On appeal, Moyer contends that the conflict triggered a duty for the trial judge to recuse from the case, rather than to attempt to ameliorate the effect of the conflict. He does not point to any actual prejudice flowing from the judge's refusal to recuse, but, citing to *State v. Robinson*, 293 Kan. 1002, 1032, 270 P.3d 1183 (2012), Moyer claims that we must presume prejudice to the defendant where the probability of bias or prejudice is just too high to be constitutionally tolerable. He claims that such an intolerably high probability exists where a father-and-son relationship is involved.

*Standard of Review*

This court exercises de novo review over whether a trial court judge's recusal is required. See *State v. Sawyer*, 297 Kan. 902, 909, 305 P.3d 608 (2013) ("We judge the adequacy of due process under a de novo standard of appellate review."); *Kansas Judicial Review v. Stout,* 287 Kan. 450, 459, 196 P.3d 1162 (2008) ("The interpretation of a Supreme Court rule, like the interpretation of a statute, is a question of law."); *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 385, 22 P.3d 124 (2001) ("When faced with an affidavit of prejudice filed pursuant to K.S.A. 20-311d, this court has unlimited review, and on appeal must decide the legal sufficiency of the affidavit and not the truth of the facts alleged.").

*Analysis*

"Kansas law provides at least three possible bases for litigants to seek recusal of a trial judge:  [1] the Kansas Code of Judicial Conduct, Supreme Court Rule 6.01(b), Canon 2, Rule 2.2 (2013 Kan. Ct. R. Annot. 735); [2] K.S.A. 20-311d(c); and [3] the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *State v.*

*Hurd*, 298 Kan. 555, 568, 316 P.3d 696 (2013) (citing *State v. Sawyer*, 297 Kan. at 905-06). Moyer contends that all three bases required Judge Showalter to recuse in this case.

In *Sawyer*, this court discussed the interplay between the three bases for recusal and the corresponding approach for addressing arguments under each:

"The United States Supreme Court has characterized the Due Process Clause as the '"constitutional floor"' on recusal claims, with the ceiling set by '"common law, statutes, or the professional standards of the bench and bar."' *Caperton* [*v. A.T. Massey Coal Co.*,] 556 U.S. [868,] 889[, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009)] (quoting *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 [1997]). The Court has recognized that Congress and the States are free to '"adopt recusal standards more rigorous than due process requires"' and that generally 'the codes of judicial conduct provide more protection than due process requires.' *Caperton*, 556 U.S. at 889-90, (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 793, 122 S. Ct. 2528, 153 L. Ed. 2d 694 [2002] [Kennedy, J., concurring]). Accordingly, 'most disputes over disqualification will be resolved without resort to the Constitution.' *Caperton*, 556 U.S. at 890.

"This language suggests that, when all three types of arguments have been raised, the proper analysis for disqualification claims begins with the statutory framework and the Code of Judicial Conduct. Analysis under these provisions may eliminate the need for constitutional analysis, see *Wilson v. Sebelius*, 276 Kan. 87, Syl. ¶ 3, 72 P.3d 553 (2003) (appellate court should avoid making unnecessary constitutional decisions), because a claim based on K.S.A. 20-311d and/or the Code of Judicial Conduct that is resolved in the claimant's favor would end the matter. Also, it is at least theoretically possible that a claim invoking K.S.A. 20-311d and/or the Code of Judicial Conduct may relate to a problem that does not implicate the Due Process Clause. See *Caperton*, 556 U.S. at 876 (kinship recusal generally matter of legislative discretion rather than one of constitutional validity); see also K.S.A. 20-311d(c)(3) (kinship basis for recusal)." *Sawyer*, 297 Kan. at 906-07.

We will follow the *Sawyer* paradigm, beginning with our statutory law.

*Statutory Basis for Recusal*

K.S.A. 20-311d(a) provides a statutory procedure for a party or a party's attorney to move for a change of judge based on the belief "that the judge to whom an action is assigned cannot afford that party a fair trial in the action." "Under K.S.A. 20-311d, a party must first file a motion for change of judge; if that motion is denied, then the party must immediately file a legally sufficient affidavit alleging grounds set forth in the statute." *Sawyer*, 297 Kan. at 908.

It does not appear from the record that Moyer complied with the statutory procedure for seeking recusal. Moyer's brief points out that his trial counsel told the trial court judge that he submitted an affidavit as required by the statute; however, the brief goes on to state: "It appears that K.S.A. 20-311d was not complied with by Mr. Moyer's attorney." The record does not contain an affidavit alleging grounds set forth in the statute. As this court pointed out in *Sawyer*:

> "'When faced with an affidavit of prejudice filed pursuant to K.S.A. 20-311d, this court has unlimited review, and on appeal *must decide the legal sufficiency of the affidavit and not the truth of the facts alleged*. [Citations omitted.] We examine whether the affidavit provides facts and reasons pertaining to the party or his or her attorney which, if true, give fair support for a well-grounded belief that he or she will not obtain a fair trial. [Citation omitted.] We determine whether the charges are grounded in facts that would create reasonable doubt concerning the court's impartiality, not in the mind of the court itself, or even necessarily in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances. [Citation omitted.]' *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 385, 22 P.3d 124 (2001)." (Emphasis added.) *Sawyer*, 297 Kan. at 908.

Obviously, without an affidavit in the record, we cannot "decide the legal sufficiency of the affidavit." *Cf. Hurd*, 298 Kan. at 570 ("Thus, we conclude Hurd's affidavit failed to allege facts requiring Judge Peterson's recusal under K.S.A. 20-311d.").

Nevertheless, Moyer argues that his failure to comply with the statute should not be fatal, citing *State v. Alderson*, 260 Kan. 445, 454, 922 P.2d 435 (1996), where the trial judge informed the parties of his extrajudicial connection the day before the trial began. This court held that "due to the late disclosure, we are somewhat reluctant to bar the defendant's claim simply because the defendant did not make an effort to comply with K.S.A. 20-311d." 260 Kan. at 453. In contrast, Moyer was not faced with an eleventh hour disclosure by the district court, but rather he had ample time to file a motion for recusal. He simply failed to follow up with filing the requisite affidavit with the chief judge, or he failed to include the affidavit in the record on appeal. See *State v. Bridges*, 297 Kan. 989, 1001, 306 P.3d 244 (2013) (party claiming error has burden of designating a record affirmatively showing prejudicial error or appellate court presumes trial court action was proper). In either event, a piece that is critical to an effective appellate review of Moyer's statutory claim is missing from our record. Accordingly, Moyer's recusal claim under K.S.A. 20-311d is necessarily denied.

*Code of Judicial Conduct Basis for Recusal*

Moyer argues that the Kansas Code of Judicial Conduct (the Code) required Judge Showalter to recuse. Kansas Supreme Court Rule 601B, Canon 2 (2014 Kan. Ct. R. Annot. 761), states: "A judge shall perform the duties of judicial office impartially, competently, and diligently." Rule 2.11 of this Canon addresses disqualification: "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." 2014 Kan. Ct. R. Annot. 767. Moyer points

to Rule 2.11(A)(2)(c) and (d), which requires disqualification under the following specific circumstances:

> "(2) The judge *knows* that the judge, the judge's spouse or *domestic partner*, or a person with the *third degree of relationship* to either of them . . . is:
>
> . . . .
>
> "(c) a person who has more than a *de minimis* interest that could be substantially affected by the proceeding; or
>
> "(d) likely to be a material witness in the proceeding." 2014 Kan. Ct. R. Annot. 767-68.

The Code's terminology section states that "'[d]e minimis,' in the context of interests pertaining to disqualification of a judge, means an insignificant interest that could not raise a reasonable question regarding the judge's impartiality." Rule 601B (2014 Kan. Ct. R. Annot. 753).

Interestingly, the preamble to the Code indicates that the purpose of the Code is to "establish[] standards for the ethical conduct of judges and judicial candidates." 2014 Kan. Ct. R. Annot. 752. Pointedly, the Scope section admonishes that "[t]he Code is not designed or intended as a basis for civil or criminal liability" and that it is not "intended to be the basis for litigants to seek collateral remedies against each other or to obtain tactical advantages in proceedings before a court." 2014 Kan. Ct. R. Annot. 753. Arguably, the Code was not intended to create a cause of action for litigants, albeit we have previously considered the Code as a separate basis for recusal. The State has not asked us to change that tack.

A case in point is *State v. Logan*, 236 Kan. 79, 689 P.2d 778 (1984), where this court entertained a defendant's argument that the Code required a judge to recuse, even though the *Logan* court had determined that recusal was not required under our statutes.

39

*Logan* involved a judge whose son worked for the district attorney's office in the same district where the judge presided over criminal matters. At the time, there was no Kansas precedent construing what is now Canon 2, Rule 2.11 (with a minor wording change), so the *Logan* court looked to the federal courts' interpretation of 28 U.S.C. § 455(a), which required disqualification of a federal judge whose "impartiality might reasonably be questioned." 236 Kan. at 86.

The *Logan* court was persuaded by *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456 (5th Cir. 1977), *cert. denied* 434 U.S. 1035 (1978), which involved a judge whose son was an associate at the same law firm as the defendant's attorney. The Fifth Circuit held the district judge did not abuse his discretion in concluding that his impartiality could not reasonably be questioned. This court noted that *Weinberger* distinguished *SCA Services, Inc. v. Morgan*, 557 F.2d 110 (7th Cir. 1977), where the Seventh Circuit held that the judge should have recused when his brother was a partner in the law firm representing one of the parties, because even though the brother was not involved in the litigation, he had a financial interest in the outcome of the proceedings as a partner in the firm. 236 Kan. at 86-87 (discussing *Morgan*). *Logan* opined that *Weinberger* implied that a family member's "'financial interest'" in the outcome was the determining factor in whether a judge is required to recuse.

Applying that test, the *Logan* court reasoned that the presiding judge's son's employment as a public servant in the district attorney's office did not give the son a pecuniary interest in the outcome of a criminal case prosecuted by the office. 236 Kan. at 87. Further, the son's nonpecuniary interests of reputation and good will were not enough, standing alone, to create an appearance of impropriety. 236 Kan. at 87; see also *Rodriguez-Vilanova v. Stryker Corp.*, 987 F. Supp. 2d 153, 156 (D.P.R. 2013) (recusal not required under 28 U.S.C. § 455[a], when judge's son was an associate at law firm

representing defendant, did not actively participate in the litigation, and had not privately communicated with his father about the case).

Finally, *Logan* discussed and rejected the potential for a "pro-prosecution" bias when the presiding judge's son works for the district attorney. This court held that "it seems unlikely that a reasonable person would believe that a judge's propensity to convict criminal defendants would increase because his son works as a prosecutor." 236 Kan. at 87. *Logan* reasoned that extending this logic would require recusal in medical malpractice cases when the judge's son was a doctor. 236 Kan. at 87. In similar fashion, we would reject the notion that Judge Showalter would have a "pro-prosecution" bias simply because his son is a law enforcement officer.

But what distinguishes *Logan* and *Weinberger* from our case is that the judges' sons in those cases did not actively participate in the case over which the judge was presiding. Here, we are not merely concerned that Officer Showalter was employed by the law enforcement agency that investigated Moyer. Rather, the judge's son actively participated in the defendant's arrest and was a witness in the proceeding over which Judge Showalter was presiding. The State's choice not to call Officer Showalter in its case-in-chief did not destroy his status as a witness nor did it erase the direct evidence that Officer Showalter possessed. As the prosecutor acknowledged, there was a possibility that the defense might want to put him on the stand.

Moreover, it gives us pause that a judge would order that his son be stricken as a witness—essentially ordering that the evidence be altered—in order to avoid recusal. Nevertheless, the focus here is not on whether the judge attained the aspirational goal of avoiding any appearance of impropriety when viewed generally. Rather, the focus is on assuring that the defendant obtained a fair trial, free from any bias or prejudice that might flow from the judge's familial relationship with a participant, when viewed from the

41

jury's perspective. Here, the judge's son did not testify and the jury was never informed that the judge had a relative that was involved in the case in any capacity. The probability of prejudice or bias that Moyer claims was intolerably high was actually zero percent with this jury, given that it was unaware of any facts that might lead to such a perception. Accordingly, even if one could discern that the Code suggested that Judge Showalter should have recused, any such error was harmless beyond a reasonable doubt.

*Due Process Basis for Recusal*

Finally, Moyer argues that Judge Showalter's recusal was required under the Due Process Clause. "Recusal is required under the Fourteenth Amendment's Due Process Clause when the judge is actually biased or there is a constitutionally intolerable probability of actual bias." *Hurd*, 298 Kan. 570 (citing *Sawyer*, 297 Kan. at 909).

In *Sawyer*, this court reiterated the two-part test it had previously used to determine whether a criminal defendant is entitled to a conviction reversal because of a judge's failure to recuse. 297 Kan. at 909. That test asks "whether the judge had a duty to recuse from the case because the judge was biased, prejudiced, or partial. If so, then the test has examined whether the judge's failure to recuse resulted in actual bias or prejudice." 297 Kan. at 909. *Sawyer* questioned, but did not answer, whether the test continued to be viable given the conflation of the bases for recusal. The court opined that "there has always been a safety valve that relieved a defendant of the obligation to show actual bias or prejudice" when "'"experience teaches that the probability of actual bias . . . is too high to be constitutionally tolerable."'" 297 Kan. at 909 (quoting *Caperton v. A.T. Massey Coal, Co.*, 556 U.S. 868, 877, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 [2009]).

Specifically, *Sawyer* discussed four nonexclusive categories where

"as an objective matter, recusal would be required in order to satisfy due process: when a judge has a direct, personal, substantial pecuniary interest in the case; when a judge has an indirect financial interest in the case's outcome; when a judge issues a contempt citation in one case and proceeds to try the contempt citation; and, in rare instances, when a litigant donates to a judge's campaign for office." *Sawyer*, 297 Kan. at 909.

The circumstances alleged by Moyer do not fit into the categories discussed in *Sawyer*, albeit those categories were not intended to be the exclusive objectively prejudicial scenarios. But as discussed above, where the jury was unaware that the judge's son was involved in Moyer's case, one cannot objectively declare that the probability of bias was unconstitutionally intolerable. Consequently, without having presented any showing of actual bias or prejudice, Moyer's claim of a due process violation fails.

COMPLAINTS ABOUT TRIAL COUNSEL

Moyer raises three issues that involve his trial counsel, Jeffery Mason. Specifically, Moyer claims that (1) the district court denied him due process by failing to conduct a meaningful hearing on his pro se pretrial motions for new counsel; (2) the district court failed to sufficiently inquire into Mason's conflict of interest; and (3) he is entitled to a *Van Cleave* remand to the district court on the question of whether he was provided effective assistance of counsel. We remand to the district court for further proceedings on the conflict of interest and ineffective assistance of counsel claims.

*Standard of Review*

Generally, "a district judge's refusal to appoint new counsel is reviewed under an abuse of discretion standard." *State v. Burnett*, 300 Kan. 419, 449, 329 P.3d 1169 (2014)

43

(citing *State v. Sappington*, 285 Kan. 158, Syl. ¶ 4, 169 P.3d 1096 [2007]). But here, Moyer does not argue that the district court abused its discretion in refusing to appoint new counsel. Rather he contends that he was denied due process because the district court failed to conduct a meaningful hearing on his pro se pretrial motions for new counsel. "The question of what process is due in a given case is a question of law." *State v. Wilkinson*, 269 Kan. 603, 609, 9 P.3d 1 (2000).

We have described our standard for attorney conflicts as follows:

"When the district court is confronted with a potential conflict of interest issue, it is required to make an appropriate inquiry into the conflict. If an appropriate inquiry is made, the district court's decision is reviewed under an abuse of discretion standard. [*State v.*] *Carter*, 284 Kan. [312,] 321[, 160 P.3d 457 (2007)]; *State v. Vann*, 280 Kan. 782, Syl. ¶ 1, 127 P.3d 307 (2006) (same). But a district court abuses its discretion when it makes no inquiry into the nature of the conflict. 280 Kan. 782, Syl. ¶ 1.

"Judicial discretion is abused if judicial action is (1) arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would take the view adopted by the trial court; (2) based on an error of law, *i.e.*, the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). The defendant bears the burden of showing the court abused its discretion. *State v. Hulett*, 293 Kan. 312, 319, 263 P.3d 153 (2011)." *State v. Stovall*, 298 Kan. 362, 370, 312 P.3d 1271 (2013).

With respect to the ineffective assistance of counsel claim, this court exercises "its discretion when deciding whether to remand a case for an evidentiary hearing." *State v. Levy,* 292 Kan. 379, 389, 253 P.3d 341 (2011) (citing *State v. Van Cleave*, 239 Kan. 117, 119-21, 716 P.2d 580 [1986]).

44

*Analysis*

*Pretrial Motions for New Counsel*

Moyer argues that he was denied the opportunity to be heard at a meaningful time and in a meaningful manner on three pro se pretrial motions requesting the termination and replacement of his court-appointed counsel. See *Wilkinson*, 269 Kan. at 608 ("The basic elements of procedural due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner."). Moyer asserts that his case is almost identical to *State v. Vann*, 280 Kan. 782, 127 P.3d 307 (2006), where this court held the district court abused its discretion in failing to inquire into Vann's asserted conflict of interest. This holding was based in part on the district court's failure to conduct "any inquiry whatsoever" into Vann's "pro se motion to discharge his attorney alleging a conflict of interest." 280 Kan. at 792; see also *State v. Brown*, 300 Kan. 565, 577, 331 P.3d 797 (2014) ("The duty to inquire accrues when the court first learns of the potential conflict, and that duty does not decay or dissipate just because a pro se defendant fails to give the court multiple reminders of its duty throughout the proceedings.").

But the record does not support Moyer's contentions. To begin, the record on appeal reflects only two motions:  one filed by Moyer on July 1, 2009, and the other filed by Mason on October 29, 2009. Moyer's July motion to dismiss Mason stated his dissatisfaction with Mason's level of communication about his case and declared:  "I fired Mr. Mason, because I feel that he is bias[ed], he wants to plea bargain me out, and he doesn't come over to the jail to go over my case." Mason's October motion to change attorney, filed on behalf of Moyer, had attached a note from Moyer indicating that he was "firing" Mason and asked for an "'emergency motion'" to appear in front of the district court to "change to a different court appointed attorney!"

Next, the record indicates that the district court did provide Moyer due process. On November 2, 2009, the district court held a hearing to address Moyer's motion to change attorney, at which the judge asked Moyer to explain his request. Moyer indicated that there had been a loss of communication and unproductive meetings because he and Mason "talk about the same stuff over and over"; that his biggest concern was Mason's failure to line up expert witnesses to rebut and point out inconsistencies in the State's evidence; and that Moyer felt Mason was "fully qualified" to answer his questions, but that he was not doing so in a timely fashion. Moyer, Mason, and the district court discussed Moyer's concerns, and, at the end of the hearing, the court determined that the attorney/client relationship between Mason and Moyer was not materially broken down. See *Brown*, 300 Kan. at 575 ("If a defendant seeks substitute counsel, the defendant 'must show "justifiable dissatisfaction" with his or her appointed counsel,' which can be 'demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.' [Citation omitted.]"). Consequently, the court denied the motion for new counsel, albeit Moyer does not argue that the motion denial was erroneous, *i.e.*, that the court should have found justifiable dissatisfaction. See *State v. McCaslin*, 291 Kan. 697, 709, 245 P.3d 1030 (2011) (issue not briefed deemed waived and abandoned).

Pointedly, Moyer's brief does not point us to any specific deficiencies that he believes made the district court's inquiry insufficient, and we can discern none. Moreover, the record reflects that Moyer was afforded all of the process to which he was constitutionally due. Accordingly, Moyer's due process challenge is simply unavailing.

*Defense Attorney's Conflict of Interest*

Moyer argues that he was denied his right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution because of a

46

conflict of interest and a defective performance of duties. The alleged conflict of interest is based on Mason having been appointed guardian ad litem for a child in need of care who he later identified as an exculpatory defense witness. The alleged defective performance was failing to properly subpoena the child witness.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Not only is the accused entitled to the assistance of competent counsel, but also "[t]he right to counsel encompasses the right to representation that is free from conflicts of interest." *Stovall*, 298 Kan. at 370 (citing *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 [1981]). As this court recently reiterated in *State v. Sharkey*, 299 Kan. 87, 96, 322 P.3d 325 (2014):

> "'It is the task of the district judge to ensure that a defendant's right to counsel under the Sixth Amendment to the United States Constitution is honored. [Citations omitted.]' *State v. Carter,* 284 Kan. 312, 321, 160 P.3d 457 (2007). In order to fulfill this duty, 'where a trial court becomes aware of a possible conflict of interest between an attorney and a defendant charged with a felony, the court has a duty to inquire further.' *State v. Vann,* 280 Kan. 782, Syl. ¶ 1, 127 P.3d 307 (2006)."

The potential conflict of interest came to the court's attention during trial, when a conference was held outside of the presence of the jury to discuss the availability of defense witness, J.T. After advising the court that J.T. was apparently not available to testify on Moyer's behalf, Mason made a record of the events leading to Moyer's desire to call J.T. as a defense witness and the issues presented because of J.T.'s failure to testify. The timeline is as follows.

On April 9, 2009, the court appointed Mason to represent Moyer in this case. On November 9, 2009, the State filed a motion in limine to prohibit any evidence of

47

subsequent sexual conduct of J.M. or H.M. In that motion, the State discussed an event reported on August 4, 2009, alleging that J.M. and her younger sister H.M. had exposed their chests to Kelly Traxel, J.T.'s father, in order to stay at the Traxel home longer.

On December 14, 2009, Mason was appointed as guardian ad litem for J.T. in a Child in Need of Care (CINC) matter. J.T.'s CINC case did not involve Moyer. The district court pointed out that Mason was the only local attorney willing and capable of taking CINC cases.

In January 2010, Mason participated in J.T.'s CINC hearing as her guardian ad litem. The duty of a guardian ad litem is to "represent the best interests of the child," K.S.A. 2014 Supp. 38-2205(a), and the guardian ad litem "shall continue to represent the client at all subsequent hearings in proceedings under this code, including any appellate proceedings, unless relieved by the court upon a showing of good cause or upon transfer of venue." K.S.A. 2014 Supp. 38-2205(d).

After the CINC hearing concluded, Mason informed J.T. that he represented Moyer and asked J.T. if he could speak to her about J.M. and H.M. She agreed to talk with Mason and explained that she knew J.M. and H.M.; that she was aware of the sexual abuse allegations J.M. made against Moyer; and that J.M. and H.M. had told her that the allegations made against Moyer were false. J.T. told Mason that she was willing to testify in Moyer's case. Mason believed that J.T.'s testimony would "have had nothing to do with the State's Motion In Limine" regarding J.T.'s father.

Close to the trial date, Mason attempted to locate J.T. to subpoena her to testify, and he learned she was at the St. Catherine's Hospital psychiatric ward in Garden City. Mason discussed with Moyer the dangers of calling a witness suffering from mental problems, but Moyer said he still wanted J.T. to testify. After Mason contacted J.T. to

48

assess her ability to testify and to determine the substance of her testimony, he subpoenaed her. But Mason was informed that J.T.'s doctor would not approve J.T. coming to Goodland to testify because she needed to go immediately to a residential psychiatric treatment facility.

Mason acknowledged the potential conflict of interest created because of his roles as J.T.'s guardian ad litem and Moyer's defense attorney, and he admitted to the court that he had not obtained a written waiver of conflict from either Moyer or J.T. But he nevertheless asserted: "I don't believe that there's a conflict under the circumstances." That assertion was followed by a discussion of submitting the testimony of an unavailable witness, in which Mason asserted that there would be "an absolute conflict of interest if the question would be whether I would be presenting—presenting that evidence to the Court or to the jury. I can't do that because I'm Mr. Moyer's attorney, but the information that came to me came only to me."

The State responded by pointing out that Mason had failed to advise the court about this potential conflict of interest at any of the earlier court hearings. Further, the State argued that the potential conflict of interest was a secondary consequence of the defense counsel's failure to properly subpoena J.T.

The district court made the following findings on the record, with emphasis added:

> "Then the situation is this as near as I can tell: This case has been lengthy in its preparation, the counsel have been extremely professional in the submissions so far.
> "It would appear to me that the State and the Defense have both been given a wide latitude in regards to presenting their cases and their theories. I understand that Mr. Moyer is given the authority to have the theory of his defense and that the jury should weigh that theory of defense. *I also note that the subpoena was issued just this morning.*

49

Whether it's valid, whether it's invalid will be decided by others, not me because the bottom line is this: *I find that first of all, in the first issue in regards to the conflict of the guardian ad litem, whether he should have been talking, whether he shouldn't have been talking, I understand completely why Defense has done what they've done, they've said what they've said.*

"*I have found that Mr. Mason's behavior in the past has always been to the utmost of the legal and ethical duties that are required. If there is an issue, if there is a problem, then those problems will be dealt with by others.*

. . . .

"The issue, the critical issue that I see is really twofold for the day, and that is the testimony of the unavailable witness or pseudo-unavailable witness really is more conflicted than the Defense says, because we have not only the question of the testimony only coming through a defense counsel, which it cannot and should not come through; but the—second of all is if she is allowed to testify, we have got to confirm that she is in a mental state where she could testify, and we don't have that knowledge, we don't have the doctors or whatever to deal with that knowledge at this point.

"And so what I am going to do is this:  I'll give you a bit of an out. I expect that the testimony will continue from Mr. Moyer. If we find at the completion of that testimony that [J.T.] is available to travel here first thing in the morning and that there is somebody willing to testify that she is competent and capable to testify, then I will allow that to take place.

"If, however, you cannot show that, then I specifically find that the Defense has had an ample opportunity to prepare their case, that there has not been a subpoena issued prior to today's date, and that we're going to go forward and this case will be concluded and taken to the jury in an appropriate fashion." (Emphasis added.)

At the conclusion of Moyer's testimony, the parties had another chambers conference regarding J.T.'s availability to testify. Mason explained that his law partner had spoken with a screening therapist at St. Catherine's who explained that a doctor informed the screening team that J.T. "would be extremely unreliable in any testimony and would lack any credibility whatsoever." The screening therapist could not tell the law partner whether J.T. was competent to testify. The therapist relayed that J.T. was being

50

sent to a psychiatric residential treatment facility where she would not be free to leave and that they did not recommend that she be forced to testify.

The court noted: "It would appear then that the possibility of [J.T.] being capable of testifying is extraordinarily small, and even if she were, there's a question as to any value that her testimony would be given." Mason told the court, "That is exactly my assessment of it, Your Honor," and asked for additional time to speak with his client about the matter.

The court granted this request and after the conference, the following information was placed on the record:

"MR. MASON: . . . Although my client believes that the evidence that [J.T.] would testify to, as he understands it, would be beneficial to him based on what I've already put on the record, we have also expressed—discussed the fact that the information that we have from two different individuals involved in the screening processes, that her testimony today would be extremely unreliable and lack any credibility and that the State would have the opportunity to bring that to the jury's attention; and therefore, it would not be appropriate to use [J.T.'s] testimony today."

The court then had Moyer confirm that he understood what Mason had said and that he agreed with the decision to proceed. Moyer also told the court that he was satisfied with Mason's representation to that point. But the district court made no explicit finding with respect to whether a conflict of interest existed. Rather, as noted above, the judge said that he understood Mason's action, that Mason's past behavior had always been ethical, and that "if there is a problem, then those problems will be dealt with by others."

This court has held "repeatedly that a district court abuses its discretion when it fails to inquire into a potential conflict that is made known to it." *State v. Bowen*, 299

51

Kan. 339, 346, 323 P.3d 853 (2014); see also *Stovall*, 298 Kan. at 372 ("We have no hesitation in specifically stating that the trial court's failure to appropriately deal with defense counsel's declared conflicts of interest was an abuse of discretion."). Ordinarily, in that context, "'the appropriate remedy, in the absence of a suitable record on appeal concerning the alleged conflict of interest, is to remand to the trial court for a determination of whether the defendant can "establish that the conflict of interest adversely affected his counsel's performance."'" *State v. Prado*, 299 Kan. 1251, 1260, 329 P.3d 473 (2014); see also *Mickens v. Taylor*, 535 U.S. 162, 171-72, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002) (actual conflict of interest means conflict affecting counsel's performance).

Here, we have the district court inquiring into the facts underlying the alleged conflict but not making the determinations necessary for us to assess the impact on Mason's performance. For instance, the information coming out of the facility where J.T. was located suggested that it would not be in J.T.'s best interests to be forced to testify at Moyer's trial. As J.T.'s guardian ad litem, Mason had the statutory obligation to advocate for her best interests, albeit we do not know whether that duty to J.T. still existed at the time that Mason owed Moyer a duty to present the best possible defense at trial. And if those contradictory loyalties coexisted, was it possible for Mason to objectively advise Moyer on whether to attempt to force J.T.'s testimony?

On the other hand, the State argued to the district court that J.T.'s apparent unavailability was a consequence of Mason's failure to properly issue and serve a subpoena forcing her appearance. If that is true, then Moyer's Sixth Amendment right to effective assistance of counsel might well have been denied because of Mason's ineffectiveness, rather than, or in addition to, his conflict of interest. *State v. Cheatham*, 296 Kan. 417, 429-30, 292 P.3d 318 (2013) (Sixth Amendment guarantees more than attorney's mere presence at proceeding; counsel must be effective and loyal to client). We

have no findings as to Mason's deficiencies in obtaining J.T.'s presence at Moyer's trial or any inquiry into whether Mason should have preserved J.T.'s testimony in some manner.

The State argues that Moyer is not entitled to a remand because he does not ask for a *Van Cleave* hearing in his appellate brief. But Moyer's last issue specifically asks for a *Van Cleave* remand, albeit the request is conditioned upon our finding no other reason to reverse. Nevertheless, Moyer alleges ineffective assistance of counsel, including the conflict of interest complaint, with sufficient specificity to warrant a remand to resolve the issues. But *cf. Levy*, 292 Kan. at 389 (independent inquiry and investigation apart from reading the record required for *Van Cleave* remand). Accordingly, we remand for the district court to determine whether Moyer was denied his Sixth Amendment right to counsel, reserving the question of cumulative error until that determination is made.

Remanded for further proceedings on the Sixth Amendment claims. This court retains jurisdiction and reserves the question of cumulative error until the district court determines whether Moyer was denied his Sixth Amendment right to counsel.

* * *

ROSEN, J., concurring in part and dissenting in part: In spite of my agreement with nearly all of the thorough analysis and conclusions reached by the majority, I would find that Moyer has asserted a tenable claim of presumed prejudice where the probability of bias or prejudice is too high to be constitutionally tolerable. I believe that such an intolerably high probability of prejudice exists in a criminal case where the presiding judge's son was a member of the law enforcement team that arrested the defendant, is identified in various police reports that give rise to the prosecution, and then is subsequently listed as an endorsed material witness in the State's amended complaint in the case.

53

The majority correctly has recognized that

> "Kansas law provides at least three possible bases for litigants to seek recusal of a trial judge: the Kansas Code of Judicial Conduct, Supreme Court Rule 6.01(b), Canon 2, Rule 2.2 (2013 Kan. Ct. R. Annot. 735); K.S.A. 20-311d(c); and the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *State v. Hurd*, 298 Kan. 555, 568, 316 P.3d 696 (2013) (citing *State v. Sawyer*, 297 Kan. 902, 905-06, 305 P.3d 608 [2013]).

I would find that all three bases were met requiring Judge Showalter to recuse from this case.

K.S.A. 20-311d(a) provides a statutory procedure for a party or a party's attorney to move for a change of judge based on the belief "that the judge to whom an action is assigned cannot afford that party a fair trial in the action." Before the trial, the district court held a hearing on Moyer's motion to recuse. Defense counsel argued that Officer Showalter's involvement in the arrest and status as a witness in the case "would give an impression to the jury of favoritism or more significant weight" to Officer Showalter's testimony. In response, the State informed the court that it did not intend to call Officer Showalter in its case-in-chief and, therefore, the officer would only be called if the defense thought his testimony was necessary, which the State did not anticipate. The judge apparently realized the conflict and formally struck Officer Showalter as a witness and denied Moyer's motion. At a later pretrial hearing, defense counsel requested redaction of Officer Showalter's name from trial documents and that Officer Showalter "simply be referred to as the other deputy" during testimony. The prosecutor asked the court to overrule the motion and pointed out that counsel's earlier motion to recuse was improper as to form because the defendant did not file an affidavit under seal and give the motion to the chief judge. Nevertheless, Judge Showalter granted the motion, stating,

54

"This is a molehill in which we have a mountain of evidence and under the circumstances, in an abundance of caution, I see no substantial problem for the State to simply redact or erase Officer Showalter's involvement in this case."

K.S.A. 20-311d states that "a party must first file a motion for change of judge; if that motion is denied, then the party must immediately file a legally sufficient affidavit alleging grounds set forth in the statute." *Sawyer*, 297 Kan. at 908. While Moyer and his counsel did not comply with the second step by failing to file an affidavit once the initial motion was denied, the judge's actions of removing his son as an endorsed witness and then later ordering redaction of his son's name from various pieces of evidence acknowledge the inherent conflict that arose under the facts presented here. The judge's focus on the evidentiary impact on the jury is not the sole basis of the conflict. In fact, it should have become self-evident that it was the judge's presence in the case—not his son's—that necessitated the precautionary actions taken. Typically, redaction is the result when inadmissible information is contained in otherwise admissible evidence, it is not necessitated by a conflict of interest of the presiding judge. At this juncture, the judge at a minimum should have questioned his continued presence and addressed whether his son's involvement in the prosecution of the case impacted Moyer's ability to receive a fair trial in light of K.S.A. 20-311d. This is especially true since the State had just brought to the court's attention the requirements of the statute. It should have been patently obvious that simply removing his son's name from the endorsed witness list in the complaint and then erasing his involvement from among the information before the jury, *i.e.*, the evidence in the case, did not resolve the glaring lapse regarding the ethical obligation that arises under our code of judicial conduct. A duty to recuse existed under these circumstances.

Kansas Supreme Court Rule 601B, Canon 2 (2014 Kan. Ct. R. Annot. 761), states: "A judge shall perform the duties of judicial office impartially, competently, and diligently." Rule 2.11(A) of this Canon addresses disqualification:  "A judge shall

55

disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." 2014 Kan. Ct. R. Annot. 767. Rule 2.11(A)(2)(c) and (d) *requires* disqualification under the following specific circumstances:

"(2) The judge *knows* that the judge, the judge's spouse or *domestic partner*, or a person with the *third degree of relationship* to either of them . . . is:

. . . .

"(c) a person who has more than a *de minimis* interest that could be substantially affected by the proceeding; or

"(d) likely to be a material witness in the proceeding." (Emphasis added.) 2014 Kan. Ct. R. Annot. 767-68.

A judge's obligation not to hear or decide matters in which disqualification is required applies regardless of whether a motion to disqualify is filed. Rule 2.11, comment 2. (2014 Kan. Ct. R. Annot. 769).

More than a *de minimis* interest can be presumed under these circumstances. The Code's terminology section states that "'[d]e minimis,' in the context of interests pertaining to disqualification of a judge, means an insignificant interest that could not raise a reasonable question regarding the judge's impartiality." Rule 601B (2014 Kan. Ct. R. Annot. 753). Officer Showalter's interest is certainly more than de minimis in that the trial and the verdict serve to validate the appropriateness of his involvement in the arrest of Moyer.

The real question then becomes how a parent, especially one who has the responsibility of presiding judge, could not be affected by a legal proceeding in which his or her child has more than a de minimis interest. It seems clear that under our rules, a duty to recuse existed and that the actions previously taken by Judge Showalter to erase his son's name as a participant in the case did not eliminate the inherent bias created

under the circumstances of this case. At a minimum, his interest is not merely insignificant; it raises a reasonable question regarding his impartiality.

Regardless, ordering that his son's name be erased from both police reports and witness lists did not eliminate Officer Showalter's actual involvement in the arrest and subsequent detainment of Moyer. In many, if not most, serious criminal cases, the circumstances surrounding the arrest of a suspect are a critical focus of pretrial motions to suppress or dismiss. Here, it is more likely than not that Officer Showalter would be a material witness to events leading up to and including the arrest and subsequent detainment of Moyer. Thus, Officer Showalter was likely to be a material witness in the case and under our code; the judge had a duty to recuse.

Finally, I would find that recusal was required under the Due Process Clause of the United States Constitution. As the majority points out, "The United States Supreme Court has characterized the Due Process Clause as the '"constitutional floor"' on recusal claims, with the ceiling set by '"common law, statutes, or the professional standards of the bench and bar."' *Caperton* [*v. A.T. Massey Coal Co.*], 556 U.S. [868,] 889[, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009)] (quoting *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 [1997])." *Sawyer* 297 Kan. at 906. "Recusal is required under the Fourteenth Amendment's Due Process Clause when the judge is actually biased or there is a constitutionally intolerable probability of actual bias." *Hurd*, 298 Kan. at 570 (citing *Sawyer*, 297 Kan. at 909). In *Sawyer*, this court stated the two-part test utilized by the court in earlier opinions to determine whether a criminal defendant is able to obtain reversal of a conviction or sentence because of a judge's failure to recuse. 297 Kan. at 909. That test asks "whether the judge had a duty to recuse from the case because the judge was biased, prejudiced, or partial. If so, then the test has examined whether the judge's failure to recuse resulted in actual bias or prejudice." 297 Kan. at 909. This court questioned the continuing validity of the test in light of the earlier conflation of the bases

57

for recusal but did not decide the question because "there has always been a safety valve that relieved a defendant of the obligation to show actual bias or prejudice" when """experience teaches that the probability of actual bias . . . is too high to be constitutionally tolerable.""" 297 Kan. at 909 (quoting *Caperton*, 556 U.S. at 877).

*Sawyer* discussed four nonexclusive categories where

"as an objective matter, recusal would be required in order to satisfy due process: when a judge has a direct, personal, substantial pecuniary interest in the case; when a judge has an indirect financial interest in the case's outcome; when a judge issues a contempt citation in one case and proceeds to try the contempt citation; and, in rare instances, when a litigant donates to a judge's campaign for office." *Sawyer*, 297 Kan. at 909.

The majority concluded that the circumstances alleged by Moyer do not fit into the categories discussed in *Sawyer* but acknowledged that those categories were not intended to be the exclusive objectively prejudicial scenarios. Here, I would simply find the safety valve previously mentioned, when "experience teaches that the probability of actual bias . . . is too high to be constitutionally tolerable," relieves Moyer from satisfying the nonexclusive categories set forth in *Sawyer*. In *Sawyer*, 297 Kan. at 910, quoting *Caperton* we explained:

"'In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias. [Citations removed.] In defining these standards the Court has asked whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.' [Citation removed.]' *Caperton*, 556 U.S. at 883-84."

58

Clearly, under any realistic appraisal of human nature, the presence of the parent/child relationship in the context presented here poses a threat of actual bias. Actual bias is not only probable but unavoidable when a presiding judge's child is a material, endorsed law enforcement witness for the prosecution in the case against the defendant. The existence of the presiding judge-father/son-witness relationship in this case shreds any illusion of impartiality.

In my dissenting opinion in *State v. Ward*, 292 Kan. 541, 583, 256 P.3d 801 (2011), I stated:

> "Much thought and planning has been given to the creation of the courtroom setting in which the pursuit of justice is to be carried out. We strive for an ambience of dignity, consideration, respect, and, most of all, impartiality, in which each witness' testimony is given its due evidentiary weight."

The protection of such impartiality lies with the presiding judge. When the judge's impartiality is as suspect as it is in this case, the very foundation inherent in the concept of a fair trial becomes intolerably compromised.

I would find the probability of bias and prejudice under these circumstances too high to be constitutionally tolerable. Under these circumstances, Judge Showalter had a constitutional and statutory duty, as well as a duty under our Code of Judicial Conduct, to recuse. As a result, I would reverse the convictions in this matter and remand for a new trial with a different judge.

\* \* \*

STEGALL, J., dissenting: I dissent from the majority's decision to remand this case to the trial court for further findings on Steve Kelly Moyer's ineffective assistance of

counsel claims. Employing an abuse of discretion standard, I would find that the record establishes that the trial court, while less than articulate in its rulings, conducted an adequate inquiry into the potential conflict of interest, made a sufficient record of that inquiry, and found that no conflict of interest existed. Further, I would find that Moyer has not made the necessary showing in order to obtain a *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986), remand. As such, I would affirm the results below, thus allowing Moyer to litigate his ineffective assistance of counsel claims in a subsequent proceeding brought pursuant to K.S.A. 60-1507.

The majority is unclear as to exactly how the trial court abused its discretion. It is true that a district court's complete failure to inquire into a possible conflict of interest is an abuse of discretion. *State v. Prado*, 299 Kan. 1251, 1256-57, 329 P.3d 473 (2014). Here, however, the majority acknowledges there was an inquiry. The majority does find that the trial court failed to make an adequate record and points to the fact that the "district court made no explicit finding with respect to whether a conflict of interest existed." 302 Kan. at 933. While true—and while certainly less than ideal—this failure, when viewed in the context of the entire record, does not constitute an abuse of discretion.

In fact, the district court did make a finding, though not explicit, that no conflict of interest existed. The district court made a clear record that Jeffery Mason (Moyer's counsel) did not believe he had a conflict; that the State did not believe Mason had a conflict; and that Moyer himself did not believe his counsel had a conflict. Furthermore, after learning the particular facts of the concurrent representation Mason was engaged in, the trial court explicitly ruled:  "[I]n regards to the conflict of the guardian ad litem . . . I understand completely why Defense has done what they've done", and, "I have found that [defense counsel's] behavior in the past has always been to the utmost of the legal and ethical duties that are required."

60

While not perfect, I cannot find that this ruling, coming as it did in the specific context of the court's inquiry in this case, was an abuse of discretion. The majority moves from this finding—or lack thereof—to hold that the district court did not make a record sufficient for us to determine on review whether Moyer met his burden to "''establish that the conflict of interest adversely affected his counsel's performance.'''" *Prado*, 299 Kan. at 1260 (quoting *State v. Vann*, 280 Kan. 782, 792, 127 P.3d 307 [2006]). This is followed by the majority's "what if?" speculation about how Mason might have compromised his duty to adequately and effectively represent Moyer. 302 Kan. at 934. There is, however, a far more reasonable explanation for what the majority characterizes as the trial court's failure to "make[] the determinations necessary for us to assess the impact [of the conflict of interest] on Mason's performance." 302 Kan. at 934. Simply put, there was no need for the inquiry to continue after the trial court found that no conflict of interest existed.

Finally, beyond the kind of hypothetical scenarios conjured by the majority, Moyer advances no argument to support the conflict of interest he now alleges. To the contrary, the record shows Mason's diligent efforts to obtain J.T. as a witness once he discovered her missing on the eve of trial. Mason repeatedly communicated with J.T. and her doctors to determine her availability and issued a subpoena once he discovered J.T.'s hospital stay would not be temporary. On the record before us, it is clear it was J.T.'s doctor's decision that prohibited her from appearing to testify during the trial. Moreover, the record also reveals legitimate reasons why J.T.'s testimony would likely have been detrimental to Moyer and his defense.

In short, I would find that Moyer has failed to sustain his burden to establish either that the trial court abused its discretion or that he is entitled to a *Van Cleave* remand for further factual findings. In *Van Cleave*, we held that "it is incumbent upon appellant's

61

counsel to do more than read the record and then determine that he or she would have handled things differently." 239 Kan. at 120. We noted: "Except in the most unusual cases, to assert a claim of ineffective assistance of counsel without any independent inquiry and investigation apart from reading the record is questionable to say the least." 239 Kan. at 120-21. Until now, we have regularly refused to grant a requested *Van Cleave* remand when counsel fails to do more than simply review the record and argue on appeal that trial counsel should have acted differently. See *State v. Levy*, 292 Kan. 379, 389, 253 P.3d 341 (2011).

The majority, citing to *Levy*, implicitly acknowledges that Moyer cannot meet the heretofore requirements for a *Van Cleave* remand. Instead, today's decision waters down an appellant's burden to obtain such a remand. I would continue to adhere to *Van Cleave*'s commitment to grant a remand only in "the most unusual cases." This would leave Moyer free to pursue his claims of ineffective assistance of counsel in a subsequent action brought pursuant to K.S.A. 60-1507.

BILES, J., joins the foregoing dissenting opinion.