NOT DESIGNATED FOR PUBLICATION

No. 123,267

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARK TODD LIVENGOOD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; MERYL D. WILSON, judge. Opinion filed April 29, 2022.
Affirmed.

*Chris Biggs*, of Knopp and Biggs, PA, of Manhattan, for appellant.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*,
attorney general, for appellee.

Before MALONE, P.J., POWELL and ISHERWOOD, JJ.

PER CURIAM: In 2018, M.D. obtained a protection from stalking (PFS) order
against Mark Todd Livengood. A few months later, the State charged Livengood with
violating the order after he attended the college graduation of M.D.'s adult daughter,
T.D., and communicated with T.D. after the ceremony. The case proceeded to trial and a
jury found him guilty beyond a reasonable doubt of the charged offense. Livengood now
appeals and presents several issues for this court's consideration, including whether the
trial court: (1) improperly admitted K.S.A. 2020 Supp. 60-455 evidence; (2) failed to
give an unanimity instruction based on evidence of multiple acts; and (3) violated his due

1

process rights declaring T.D. to be the only victim of the complaint and then allowing evidence beyond that scope at trial; as well as whether (4) there was sufficient evidence to support the jury's verdict based on alternative means under a "super sufficiency" analysis; (5) the PFS order violated his First Amendment rights; (6) cumulative error requires reversal of his conviction; and (7) the trial court abused its discretion in sentencing him. Following a thorough review of Livengood's case, we reject each of the claims raised and affirm his conviction and sentence.

FACTUAL AND PROCEDURAL BACKGROUND

In December 2018, T.D. participated in her graduation ceremony for Kansas State University at Bramlage Coliseum on the Kansas State campus. Her mother, M.D., and other members of her family also attended to celebrate the occasion. Just after she crossed the stage and received her diploma, T.D. proceeded down an aisle of the arena and saw a man, who she recognized as her mother's ex-boyfriend, Livengood, standing at the top of some stairs. Livengood held out his phone as if to take a picture and told T.D. "I love you so much. I'm so proud of you."

T.D. was very shocked to see Livengood because due to the persistent harassment he inflicted on the family in the two years since he and M.D. broke up, she knew her mother had an active PFS order against him. T.D. continued up the stairs, and with help from a friend, took a picture of Livengood as he left the arena. She and her mother then located a police officer and reported the incident. A short time later when the two women approached M.D.'s car to leave the arena, they noticed a "winky face" drawn on the back of the car, which T.D. recognized as a "signature" Livengood used while dating M.D.

Two months later, the State charged Livengood with one count of violating a protection from stalking (PFS) order, a class A person misdemeanor, in violation of K.S.A. 2018 Supp. 21-5924(a)(6). The complaint alleged that "on or about the 8th day of

2

December, 2018, in Riley County, Kansas, Mark Todd Livengood, did unlawfully and knowingly violate a protection from stalking order issued pursuant to K.S.A. 60-31a05 or 60-31a06, and amendments thereto, in Miami County Case No. 2018 DM 172."

The PFS order contained these conditions:

- "Defendant shall not follow, harass, abuse, molest, assault, threaten, stalk, or interfere with the privacy rights of the protected person(s), and the protected person's family or household. [ NCIC 01 & 02 ]
- "Defendant shall not enter or come on or around the premises, the residence, the property, school, or place of employment of the protected person(s) or other family or household member. [ NCIC 04 ]
- "Defendant shall not communicate in any manner with the protected person(s), the protected person's employer, employees, fellow workers, or others with whom the communication would be likely to cause annoyance or alarm the protected person(s). [ NCIC 05 ]
- "Defendant shall not direct or request another to contact the protected person, either directly or indirectly. [ NCIC 04 & 05 ]
  . . .
- "Defendant shall not follow, harass, telephone, contact, recruit, harbor, transport, or commit or attempt to commit human trafficking upon the protected person."

In June 2019, the State moved to admit evidence pursuant to K.S.A. 60-455. In particular, the State requested permission to introduce evidence of Livengood's prior convictions for violating a protective order. Livengood filed a written response and challenged the admission of any prior bad act evidence.

Two months later, Livengood filed a motion for a bill of particulars. He requested clarification of "the facts relied upon by the State to show that his actions were in violation of a protective order—specifically, who the protected person was and what actions constituted a violation." The State later filed a written response asserting

3

Livengood and his appointed counsel were already in receipt of discovery and that Livengood had been personally served with the PFS order from which the charges arose.

The trial court conducted a hearing on the parties' motions and opened with Livengood's request for a bill of particulars. Defense counsel asked the court to require the State to identify a specific victim and clarify precisely how and where the order was violated. Counsel argued that Livengood's defense could "materially change" based on this information. Counsel also asserted that the discovery provided by the State suggested multiple people could potentially fall under the Order's protective umbrella. The State explained it provided discovery related to what law enforcement investigated and what the victim alleged. It also clarified that the charge only pertained to Livengood's contact with T.D. After the State agreed to be bound to T.D. as the sole victim, the court denied the motion for a bill of particulars and found the statutory requirements were satisfied because the complaint also identified the PFS order alleged to have been violated. The court also entertained arguments on the State's K.S.A. 2020 Supp. 60-455 motion but took the matter under advisement.

A little over two weeks later, the trial court denied the State's K.S.A. 2020 Supp. 60-455 motion. Even so, it ordered "that if the defendant testifies stating it was a mistake or he did not understand the Protection from Stalking Order, the State may present K.S.A 60-455 evidence as rebuttal."

In October 2019, Livengood filed a motion in limine requesting exclusion of any prior bad acts or uncharged conduct under K.S.A. 60-455(a). He asserted that the court previously prohibited the State's use of specific prior convictions, and similarly sought exclusion of any other evidence concerning prior bad acts of a similar nature because its prejudicial effect would outweigh the probative value. The State argued in response that the court did not issue a blanket prohibition over the use of K.S.A. 60-455 evidence. Rather, it simply admonished the State that the introduction of such evidence was limited

4

to rebutting any testimony offered by Livengood to contend that his actions stemmed from a mistake or misunderstanding of the PFS order.

The trial eventually got underway and T.D. testified that M.D. drove the two of them to the graduation ceremony early that morning in M.D.'s car and her grandparents and brother arrived separately later. T.D. recalled for the jury that as she left the arena after receiving her diploma, she looked up and saw Livengood standing at the top of the stairs. T.D. said Livengood appeared to be holding his phone up as if he were recording or taking a photo and told her "I love you so much. I'm so proud of you."

T.D. further testified that as soon as she saw Livengood she experienced a panic attack and nearly passed out. With help from a friend, she managed to take a picture of Livengood which the State then admitted as State's Exhibit 2. T.D. described her emotions in that moment as being in shock, worried and fearful. She informed the jury that Livengood and her mother broke up in 2016, following a five-year relationship, but he had subjected the family to nonstop harassment ever since. She was aware of the PFS order against Livengood so just after seeing him, T.D. alerted her mother to his whereabouts so she could avoid him. She and her mother filed a report with the security officers staffing the ceremony and walked to M.D.'s vehicle. As they approached, T.D. noticed a "winky face" drawn on the back of the car that was not there previously. T.D. informed the jury that Livengood used the image as a signature of sorts when he gave cards to her mother during their relationship. The State admitted a photo that T.D. took of the "winky face," prompting an objection from Livengood's counsel that the evidence fell outside the scope of the court's previous ruling that T.D. was the victim of the crime. The court overruled the objection.

T.D. testified that she suffers two to three panic attacks a month as a result of the incident and cannot leave her house without feeling like she is being followed. She stated that upon seeing Livengood that day she feared for her own safety, as well as for that of

5

her family. She agreed that Livengood only had isolated contact with her at the arena and he was not the only person able to draw the "winky face" on her mother's car. T.D. also testified, however, that she received a graduation card from Livengood in the mail after the incident occurred.

Maranda McMichael testified that she graduated with T.D. and as they proceeded to a commons area following the ceremony, she heard a man say to T.D. "Hey, kiddo, I'm so proud of you. I love you." McMichael at first found the sentiment endearing but noticed T.D.'s breathing was labored immediately afterwards. She asked whether that was the man responsible for the harassment her family endured and T.D. responded in the affirmative.

M.D. also testified and told the jury she dated Livengood for five and a half years, but their relationship ended on Christmas Day in 2016. Not long after, M.D. applied for and received a PFS order against Livengood which remained active at the time of T.D.'s graduation. The State admitted a copy of the PFS order as State's Exhibit 1. She told the jury that she was alarmed "but not surprised" that Livengood attended the graduation ceremony, but the encounter adversely impacted her because it robbed T.D. of the chance to celebrate her graduation with mostly "happy moments." Instead, they were once again forced to stop what they were doing and deal with Mr. Livengood. On cross-examination, M.D. acknowledged that Livengood treated T.D. as his own daughter during their relationship, but that ended the moment he became violently verbally abusive on the day they broke up.

After the State rested, Livengood moved for a judgment of acquittal on the grounds that the PFS order did not extend protection to T.D. so the State's evidence failed to support a violation of that order. The State responded that the order encompassed the protected person's family. The court agreed and denied Livengood's motion.

6

Livengood testified in his own defense and admitted he was present at the graduation ceremony. He stated that he arrived alone around 8 a.m., entered the arena and chose a seat at random with no knowledge of where the graduates would ultimately exit. Livengood said he "vaguely" recalled T.D. walking up the aisle near his seat and reportedly felt shock because he did not expect her to walk past him. He asserted that he froze and did not speak a word to her. He did recall that she uttered "no" several times as she passed him. Livengood claimed that he waited for the last graduate to pass and then left to return home to Lawrence. He explained he had no intention to contact T.D. or M.D. that day, he simply wanted to watch her graduate. Livengood denied drawing a "winky face" on M.D.'s vehicle and claimed he did not even see her car.

During the jury instruction conference, defense counsel asked the court to include T.D.'s name in the elements of the crime based on the court's pretrial ruling that T.D. was the victim of the charged offense. The court denied the request and explained:

> "as I indicated, in your motion, the victim is the mother, but the order in—the paragraph in the stalking order makes reference to the person's family or household members, so by simply contacting them, my ruling is that that is, in fact makes that a violation of [M.D.] the mother's order."

The jury found Livengood guilty of violating a protective order.

At sentencing, defense counsel requested imposition of supervised probation in Douglas County rather than a jail term in Riley County and offered several factors in support of his request. Counsel asserted the requested disposition was appropriate because the contact at issue was brief and could not be said to be fueled by a malicious intent given that he only attended the ceremony to show his support for T.D. Additionally, he informed the court that Livengood had successfully completed probation and a corresponding rehabilitation program since the conclusion of his trial. Defense counsel also explained that Livengood was currently relegated to a wheelchair after

7

sustaining significant injuries in a car accident following his trial. Thus, he was homebound and unable to work, which made it difficult to pay his medical bills or afford surgery. Finally, counsel highlighted that the incident prompting Livengood's conviction did not involve physical abuse.

The trial court denied Livengood's request and imposed a 12-month jail sentence. The court explained that it was "significant" that Livengood's criminal history included several previous convictions for violating a protective order, stalking, and criminal trespass. The judge also remarked that he found Livengood's stated intention in attending the ceremony to be "a little hollow . . . because of the smiley face that was left on the car [that] he obviously had to look and hunt for that, and find it in the Bramlage parking lot."

Livengood timely appealed the trial court's ruling.

ANALYSIS

DID THE COURT ERR IN ALLOWING THE STATE TO INTRODUCE EVIDENCE OF THE IMAGE ON M.D.'S CAR WITHOUT FIRST SUBJECTING IT TO AN ANALYSIS UNDER K.S.A. 2020 SUPP. 60-455?

Livengood's first argument on appeal consists of a claim that the trial court erred when it allowed the State to present evidence related to the "winky face" drawing on M.D.'s car. According to Livengood, admission of this evidence without first scrutinizing it under a prior bad acts analysis consistent with K.S.A. 2020 Supp. 60-455 amounted to prejudicial error. He contends exclusion of the evidence was necessary because M.D. was not the true victim in the case given the court's pretrial ruling on his motion for bill of particulars where it identified T.D. as the victim; therefore, his identity was not in question.

8

But as the State correctly points out, while Livengood did object at trial to the admission of the photo T.D. took of the "winky face", K.S.A. 2020 Supp. 60-455 was not the foundation for his objection. That is a new angle he presents to us for the first time on appeal. Under K.S.A. 60-404:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

Stated another way, a party must make a contemporaneous and specific objection to the admission of evidence to preserve the issue for appeal. *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862, *cert. denied* 137 S. Ct. 310 (2016); *State v. King*, 288 Kan. 333, 348-50, 204 P.3d 585 (2009) (stressing the importance of the requirement of an objection under K.S.A. 60-404). Furthermore, the Kansas Supreme Court has consistently declined to review evidentiary challenges without an objection at trial "even if the issue involves a fundamental right." *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010); see also *State v. Logsdon*, 304 Kan. 3, 28, 371 P.3d 836 (2016) (rejecting claim that exception applied to the erroneous admission of evidence with no timely or specific objection).

A thorough review of the trial transcript shows that Livengood did not preserve a challenge to the evidence based on K.S.A. 2020 Supp. 60-455. Defense counsel first objected when the State initially asked T.D. about the vehicle and stated, "I believe this is something that the Court took up prior to the trial with this—what I believe the answer to this question is going to be." The court overruled the objection. A few moments later, after T.D. explained that she noticed the "winky face" drawing on M.D.'s car and the State started to lay its foundation for admission of the photo, defense counsel requested a sidebar. The following exchange ensued:

"[DEFENSE COUNSEL]: My understanding of the previous ruling by this Court was that [T.D.] was the—the State was bound that [T.D.] was the only victim of the actions to be presented, and related to my previous objection on the record in front of the jury asking about markings to the car that didn't belong to [T.D.] is going outside that scope of who the victim is.

"[THE STATE]: Your Honor, she arrived in that vehicle. She testified that that's the vehicle her and her mother rode in. She was residing with her mother at the time. I'm not gonna go down the road of 60-455 evidence that included a prior action allegedly by Mr. Livengood on that same vehicle in a different area. That is not my intention with this, at all.

"[DEFENSE COUNSEL]: I'm not talking about the 60-455 motion, Your Honor. I'm talking about our Motion for Bill of Particulars.

"THE COURT: She can testify as to what she observed that day on that incident, both before, during and after, so I will overrule your objection.

"[DEFENSE COUNSEL]: Okay."

We decline to review Livengood's evidentiary challenge based on K.S.A. 2020 Supp. 60-455 because he explicitly rejected the opportunity to object on that ground below. He also made no attempt to renew the objection that he did rely on at trial, which is that the evidence of the "winky face" went beyond the scope of the identity of the victim.

The Kansas Supreme Court has underscored the legislative mandate in K.S.A. 60-404, "which 'dictates that evidentiary errors *shall not be reviewed on appeal* unless a party has lodged a timely and *specific* objection to the alleged error at trial.'" *State v. Richmond*, 289 Kan. 419, 428, 212 P.3d 165 (2009) (quoting *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 [2009]). As a result, we decline to review the challenged evidence through the lens of K.S.A. 2020 Supp. 60-455 for the first time on appeal.

10

DID THE TRIAL COURT ERR IN FAILING TO GIVE AN UNANIMITY INSTRUCTION?

Livengood next argues that admission of the "winky face" evidence caused a multiple acts situation which then demanded an unanimity instruction. In essence, he contends the jury might have reached a different verdict had such an instruction been given because the jurors might have disagreed about which underlying act—either the "chance encounter" inside the arena or the more intentional act of "seek[ing] out a particular vehicle" in the parking lot—led to the PFS order violation.

The State responds that Livengood's actions were essentially part of the same, unitary conduct, which began from the moment he set foot onto the campus to attend the graduation ceremony for the express purpose of watching T.D. Alternatively, the State contends it elected to pursue only one underlying act as the basis for the charge, which was that Livengood attended the ceremony and spoke to T.D.

Reviewing courts generally apply a four-step process when reviewing jury instruction issues:  (1) reviewability to consider whether proper preservation of the issue occurred; (2) the legal suitability of the instruction; (3) the factual foundation for the instruction; and (4) harmlessness of any associated error. See *State v. Broxton*, 311 Kan. 357, 360, 461 P.3d 54 (2020). A defendant's failure to raise or preserve a challenge to the jury instructions in the district court does not foreclose appellate review, it simply triggers a more demanding burden by requiring the defendant to show "clear error" in the final analytical step. K.S.A. 2020 Supp. 22-3414(3).

But as the State points out, the Kansas Supreme Court has used a more particularized test for when a defendant challenges a trial court's failure to give an unanimity instruction in a case involving multiple acts:

11

"'The threshold question . . . , over which the court exercise[s] unlimited review, [is] whether the case truly involve[s] multiple acts, *i.e.*, whether the defendant's actions could have given rise to multiple counts of the charged crime or whether the alleged conduct was unitary. . . .

"'The second step [is] a determination of whether an error occurred. If the State did not inform the jury which act to rely upon during its deliberations and the trial court did not instruct the jury that it must be unanimous about the particular criminal act that supported the conviction, there was error. . . .

"'The final step [is] to determine whether the error was reversible.' [Citations omitted.]" *State v. King*, 297 Kan. 955, 979, 305 P.3d 641 (2013).

Four factors guide our inquiry to determine whether conduct was unitary under the first step: (1) whether the acts occurred at or near the same time; (2) whether they occurred at the same location; (3) whether an intervening event occurred between the acts; and (4) whether a fresh impulse motivated any portion of the acts. *State v. Harris*, 310 Kan. 1026, 1039, 453 P.3d 1172 (2019).

Unanimity is a statutory right rather than a constitutional mandate. Thus, the nonconstitutional harmless error standard applies to the failure to elect or to give an unanimity instruction. *State v. Moyer*, 306 Kan. 342, 359, 410 P.3d 71 (2017). Under that standard there must be no probability that the error affected the outcome of the trial when considered against the entire record. 306 Kan. at 359. The facts of *King* and *Harris* help shed some light on this inquiry.

In *King*, the State charged King with felony criminal damage to property after he intentionally rammed into his father's parked vehicles, then briefly drove away only to return a few moments later to engage in the destructive conduct once more. King presented a multiple acts argument on appeal asserting two separate incidents occurred and therefore the trial court should have issued an unanimity instruction. The Kansas

12

Supreme Court agreed and observed that witness' testimony differed just enough to create an uncertainty for the jury about whether both vehicles were damaged in each incident. *King*, 297 Kan. at 982.

In *Harris*, the facts involved a kidnapping charge which alleged that Harris confined his victim to her apartment for two hours and repeatedly forced her to move from room to room while demanding money. On appeal, Harris argued the evidence showed several separate and distinct acts of restraint, each motivated by a different purpose. The Kansas Supreme Court rejected Harris' attempt to "parse the incident too finely" and found his actions were all part of a single unitary conduct. 310 Kan. at 1040.

The facts in Livengood's case are more like *Harris* than *King*, because as the State points out, Livengood's actions occurred during the course of a single, uninterrupted act—attending T.D.'s graduation ceremony to interact with her.

As for the first two factors of our analysis, time and location, while Livengood is correct that, technically, two separate acts occurred, one being his attendance at the ceremony and the other the drawing on the vehicle, that interpretation places too fine a point on the inquiry and essentially turns a blind eye to the concept of a continual course of conduct. Rather, his behavior is more aptly defined as one overall act comprised of three closely connected components: his arrival at the graduation, coupled with his personal contact with T.D. during the ceremony, and his decision to leave his signature image on M.D.'s car to alert the family to his presence. As a result, the first two steps are not resolved in Livengood's favor.

As for the third factor, an intervening event, Livengood highlights the lack of evidence to establish when exactly the "winky face" drawing was made or who bore the responsibility for doing so. In our view, these claims are of no moment. Again, the entirety of the conduct at issue occurred within the context of the graduation event, which

13

included the time immediately preceding and following the ceremony. Livengood failed to establish the occurrence of an intervening event which wholly divorced one act from another. As a result, this factor also does not come down in Livengood's favor.

Finally, as for the fourth factor, Livengood contends the incidents reveal a marked degree of separation sufficient to establish the occurrence of a fresh impulse, while still acknowledging a common purpose of "sharing the joy of graduation with [T.D.]" interwoven throughout his conduct. But the record before us paints a slghtly different picture—where Livengood's desire to see T.D. and make his presence known drove his conduct that day, a fresh impulse simply did not exist. As in *Harris*, this factor weighs strongly in favor of the State's position because Livengood admits that the purpose in his behavior was to convey a message of support to T.D. at her graduation. Filtering Livengood's contention through the governing test does not yield a result which is favorable to him. So, an unanimity instruction would not have been appropriate.

Even if Livengood's claim had survived this analysis, he still would not be entitled to the relief he seeks because the State unquestionably elected to pursue the charge based solely on the graduation encounter. As the State correctly notes, the Kansas Supreme Court has considered a prosecutor's statements made during opening and closing arguments confirming a single incident as the "functional equivalent" of an election by the State. See *State v. Moyer*, 306 Kan. 342, 361, 410 P.3d 71 (2017) (citing *State v. Dickson*, 275 Kan. 683, 696, 69 P.3d 549 [2003]).

The record shows that the State framed Livengood's violation of the PFS order in its opening statement only in the context of attending T.D.'s graduation and calling out to her at the ceremony. Then during closing arguments, the State again relied only on the fact that Livengood attended the graduation and called out to T.D. as the basis for convicting him. Stated another way, the State elected to proceed based on the encounter inside the graduation ceremony because the prosecutor never even mentioned the winky

14

face drawing as an independent basis for finding Livengood guilty. Here, the record undercuts Livengood's claim that his case necessitated an unanimity instruction. Thus, it cannot be said that the trial court erred in failing to give such an instruction.

Finally, even if error resulted from the court's failure to issue the instruction, Livengood still bears the burden to firmly establish that the error was not harmless by proving the jury would have reached a different verdict if the instruction were given. See *McLinn*, 307 Kan. at 318. On this point, Livengood argues some jurors might have considered the incident inside the arena as a "chance encounter" or otherwise concluded that the evidence did not show Livengood drew the winky face on M.D.'s car. This argument does not persuade us that reversible error occurred because, again, the State elected to pursue a specific incident as the basis for the conviction. The jury weighed the evidence and found T.D.'s testimony that Livengood spoke to her to be credible, while rejecting Livengood's testimony that he saw T.D. but said nothing. As a result, any error that could be attributed to the absence of the instruction was harmless.

DID THE TRIAL COURT VIOLATE LIVENGOOD'S DUE PROCESS RIGHTS?

In his next contention of error, Livengood asserts that the trial court's failure to grant his motion for a bill of particulars in full amounted to a due process violation.

The State responds that the trial court ruled appropriately when it adopted the State's designation of T.D. as the victim and otherwise denied Livengood's motion. Alternatively, the State contends any error by the court was harmless because Livengood fails to show how the court's decision resulted in prejudice to him. According to the State, the facts were not complex because the State believed, and presented evidence to support the theory, that Livengood violated the protective order simply by appearing at the graduation to interact with T.D.

15

This court reviews the denial of a motion for a bill of particulars for an abuse of discretion. *State v. Rojas-Marceleno*, 295 Kan. 525, 533, 285 P.3d 361 (2012). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018). As the party asserting error, Livengood bears the burden of showing the court abused its discretion. *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018).

A charging document must contain "a plain and concise written statement of the essential facts constituting the crime charged." K.S.A. 22-3201(b). A charging document is generally sufficient if it is "drawn in the language of the statute." K.S.A. 22-3201(b). But when a complaint fails to specify the particulars of a charged crime sufficiently to enable the defendant to prepare a defense, K.S.A. 22-3201(f) allows the defendant to seek clarification of a charging document by filing a written motion asking the State to furnish the defendant with a bill of particulars. When granted, "[a]t the trial the state's evidence shall be confined to the particulars of the bill." K.S.A. 22-3201(f).

The two functions of a bill of a particulars are: "' (1) to inform the defendant of the nature of the charges and the evidence to enable him to prepare a defense, and (2) to prevent further prosecution for the same offense.'" *Rojas-Marceleno*, 295 Kan. at 534 (quoting *State v. Myatt*, 237 Kan. 17, 29, 697 P.2d 836 [1985]); see also *State v. Wright*, 259 Kan. 117, 126, 911 P.2d 166 (1996) ("The object or purpose of the bill of particulars . . . is to supplement a sufficient indictment with more specificity of detail to better understand the nature of the charges, and its effect is to limit the evidence to the transactions set out in the response to the bill of particulars.").

The Kansas Supreme Court has also said there is no need for a bill of particulars "[w]hen charges in the information are clarified by facts brought out at the preliminary hearing . . . , absent a showing of surprise or prejudice." *State v. Robinson, Lloyd &*

16

*Clark*, 229 Kan. 301, Syl. ¶ 6, 624 P.2d 964 (1981). But as Livengood correctly notes, there was no preliminary hearing held here because Livengood was only charged with a misdemeanor. See K.S.A. 2020 Supp. 22-2902(1) (requiring preliminary hearing for felony cases only). That being said, Livengood's argument does not appear to be a procedural one—i.e., that the trial court is required to consider testimony at a preliminary hearing before denying his motion.

The State charged Livengood with a single count of violating a protection from stalking order, and alleged that "on or about the 8th day of December, 2018, in Riley County, Kansas, Mark Todd Livengood, did unlawfully and knowingly violate a protection from stalking order issued pursuant to K.S.A. 60-31a05 or 60-31a06, and amendments thereto, in Miami County Case No. 2018 DM 172." See K.S.A. 2018 Supp. 21-5924(a)(6) ("Violation of a protective order is knowingly violating . . . a protection from stalking, sexual assault or human trafficking order issued pursuant to K.S.A. 60-31a05 or 60-31a06, and amendments thereto.").

Livengood filed a motion for a bill of particulars and claimed that even though the complaint was drawn in the language of the statute, he was "unable to properly prepare a defense because he is unaware of the facts relied upon by the State to show that he violated a protection from stalking order." He also asked the State to provide "the facts relied upon . . . to show that his actions were in violation of a protective order—specifically, who the protected person was and what actions constituted a violation."

The State objected to the motion and argued that because Livengood and his appointed counsel both received discovery and Livengood was personally served with the PFS order in question, no bill of particulars was needed. The State highlighted that the provisions of the order directed defendant not to "'follow, harass, abuse, molest, assault, threaten, stalk, or interfere with the privacy rights of the protected person, *and the*

17

*protected person's family*'" and that "'The Defendant shall not enter or come on or around the . . . school . . . of the protected person *or other family*.'"

At the hearing on the motion, defense counsel slightly expounded on its contents to add that the State must specifically articulate "how . . . the protective order was violated and where." The State advised that the discovery provided to Livengood contained what law enforcement investigated, what the proposed victim told them, and any photographic evidence. The court inquired whether the State was alleging that Livengood "contacted more than one person for the violation, or just one?" The State clarified that it simply charged Livengood with a single count based on "evidence that Mr. Livengood did indeed contact one of the protected individuals." After the State confirmed that T.D. was the victim of the complaint and agreed to be bound to that assertion, the trial court found that the information in the complaint—specifically the PFS order alleged to have been violated—was satisfactory and denied the motion.

Livengood does not contest the trial court's designation of T.D. as the victim of the complaint. Rather, he contends that he needed to know what alleged actions violated specific provisions of the protective order so that he might prepare an adequate defense. Yet the parties agree that only three provisions of the protective order were potentially relevant based on the fact T.D. was the victim. In particular, they were those provisions that stated Livengood must not: (1) "follow, harass, abuse, molest, assault, threaten, stalk, or interfere with the privacy rights of . . . the protected person's family or household"; (2) "enter or come on or around the premises, the residence, the property, school, or place of employment of the protected person(s) or other family or household member"; or (3) "communicate in any manner with the protected person(s), . . . or others with whom the communication would be likely to cause annoyance or alarm the protected person(s)."

18

Livengood's argument essentially comes down to a conclusory assertion that his due process rights were violated because he could have defended the case differently if he had known which of the specific provisions he allegedly violated. But as the State notes, his argument consists of nothing more than that simple assertion and fails to demonstrate precisely how he would have defended against the charge based on the information requested. Moreover, the State's position at trial was that Livengood violated each of the relevant provisions by attending the graduation and contacting T.D. Thus, identifying T.D. as the victim contemplated in the complaint allowed Livengood to properly prepare his defense. The trial transcript reflects that defense counsel was seemingly already aware of the relevant provisions at trial given that he discussed each extensively during closing arguments.

As a result, we decline to find the trial court abused its discretion by the manner in which it ruled on Livengood's motion for a bill of particulars. The complaint, which was drawn in the language of the statute, and the State's stipulation that T.D. was the victim were both sufficient to inform Livengood of the nature of the charges and enabled him to effectively prepare a defense.

WAS THERE SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT?

Livengood next argues the State failed to present sufficient evidence to sustain his conviction and further contends that this court should apply a "super sufficiency" analysis based on an alternative means theory in light of the multiple provisions set forth in the PFS order. The State responds that a super-sufficiency analysis is neither appropriate nor required because Livengood was not charged with an alternative means offense.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence,

19

resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

When faced with a challenge to the sufficiency of the evidence for an alternative means crime, Kansas courts conduct what has been termed a "super-sufficiency" analysis, meaning sufficient evidence must support each alternative means charged to ensure the verdict is unanimous as to guilt. *State v. Brown*, 295 Kan. 181, 188, 284 P.3d 977 (2012). But if the case does not involve alternative means, jury unanimity is not implicated. See *State v. Swint*, 302 Kan. 326, 336, 352 P.3d 1014 (2015).

Generally, the determination of whether a case involves alternative means is a question of statutory interpretation subject to unlimited review. See *State v. Butler*, 307 Kan. 831, 841, 416 P.3d 116 (2018). An alternative means issue arises when a statute or instruction lists "alternative distinct, material elements of a crime—that is, the necessary *mens rea, actus reus*, and, in some cases, a causation element." *Brown*, 295 Kan. at 194. Thus, as Livengood recognizes, the language of the statute informs whether a case presents alternative means of a charged crime. See *State v. Angilda*, No. 106,226, 2013 WL 1234188, at *3-4 (Kan. App. 2013) (unpublished opinion) (differentiating "options within a means" from alternative means regarding the violation of a prior version of the protective order statute).

Taking Livengood's arguments in order, the State charged Livengood with violating a protective order under K.S.A. 2018 Supp. 21-5924(a)(6), which prohibits "knowingly violating . . . a protection from stalking, sexual assault or human trafficking order issued pursuant to K.S.A. 60-31a05 or 60-31a06, and amendments thereto." He contends the State's evidence failed to establish guilt beyond a reasonable doubt because his contact with T.D. simply consisted of "innocuous" statements uttered to her in a public place and, as such, were not threatening or harmful to her in any way.

Livengood seems to believe that because he perceived his statements to T.D. as "not threatening," that no reasonable person could find him guilty of violating the protective order. He essentially asks this court to view the evidence in his favor and reweigh it, which it cannot do. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021) (An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.) The protective order specifically directed him not to "communicate in any manner with the protected person(s) . . . or others with whom the communication would be likely to cause annoyance or alarm the protected person(s)." T.D. described the shock at seeing Livengood show up at her graduation uninvited and how she began having a panic attack when she spoke to him. She also testified that he had engaged in a pattern of harassment against her family since the relationship with M.D. ended. Similarly, M.D. said she was alarmed but not surprised that he showed up. She described how her memory of the event did not include "happy moments," but the frustration that "once again . . . we have to stop what we're doing and have to deal with Mr. Livengood." Based this evidence, a rational factfinder could have found Livengood guilty of violating either the following or harassing provision, as well as the communication provision of the protective order.

Livengood also challenges the definition of specific terms used in the order, including "family member," "household member," and "school." He asserts without support that "surely the [PFS] statute was intended to protect minor children of the protected person." Livengood cannot add language to the protective order that is not readily found therein, and it is not contested that T.D. is M.D.'s daughter and was living at her home when this incident occurred.

Similarly, Livengood asserts that the statutory definition of "school" does not include a university, such as Kansas State University, or Bramlage Coliseum, where the university held its graduation ceremony. Alternatively, he contends that the term "'school" is vague. See K.S.A. 2020 Supp. 21-5701(r) (defining "school property" as

"property upon which is located a structure used by a unified school district or an accredited nonpublic school for student instruction or attendance or extracurricular activities of pupils enrolled in kindergarten or any of the grades one through 12.") Rather than relying strictly on a statutory definition of "school"—particularly one that primarily applies to crimes involving controlled substances—we opt to expand our view to include the common usage of the term. See Webster's New World College Dictionary 1300 (5th ed. 2014) (defining school as either "a place or institution for teaching and learning; establishment for education; specif., . . . c) a college or university" or "the building or buildings, classrooms, laboratories, etc. of any such establishment."). Admittedly T.D.D. was not attending a class at the time of the incident, but she was participating in a graduation ceremony, as a student at that university, hosted by the school, on its grounds. A rational factfinder could conclude that Livengood's conduct qualified as "enter[ing] or com[ing] on or around the . . . school . . . of the protected person or other family or household member."

Finally, we address the second general claim Livengood raises under this issue, that the offense for which he stands convicted inherently involves alternative means because "[o]ne must essentially incorporate the order into the statute to determine what is prohibited." He provides no relevant authority for this proposition. The failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority is akin to failing to brief the issue. See *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020). That lack of authority likely bears a direct correlation to the fact that the directives Livengood violated were part of the PFS order, not K.S.A. 2018 Supp. 21-5924(a)(6), the provision under which he was prosecuted. Appellate courts are to interpret statutory language as it appears, without reading language into the statute not readily found therein. *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016). Thus, we decline to find that Livengood's case is subject to a super-sufficiency analysis.

22

Moreover, the overriding concern in issues of this nature is that when a jury is *instructed* on an alternative means in an offense for which little or no evidence was presented, it might prompt some jurors to vote to convict on that basis, thereby offending statutory requirements for a unanimous verdict. See *State v. Johnson*, 56 Kan. App. 2d 1293, 1309, 447 P.3d 1010 (2019). The instructions issued by the trial court are included in the record on appeal and reflect that the jury was simply instructed as follows for the charged offense:

> "The defendant is charged with violation of a protective order. He pleads not guilty.
>
> "To establish this charge, each of the following claims must be proved:
>
> "1. The defendant knowingly violated a protection from stalking order issued under Kansas law.
> "2. This act occurred on or about the 8th day of December, 2018, in Riley County, Kansas."

The instructions clearly stated the narrow issue the jury needed to resolve. Livengood was not in jeopardy of receiving a verdict that lacked the jury's unanimous support.

Following a review of the evidence in the light most favorable to the State, as we are required to do under the governing standard of review, we are confident the State presented sufficient evidence to sustain its burden to establish Livengood guilty beyond a reasonable doubt. That conviction is affirmed.

## DID THE PROTECTIVE ORDER UNCONSTITUTIONALLY INFRINGE ON LIVENGOOD'S FIRST AMENDMENT RIGHTS?

Livengood next raises a constitutional challenge to the protective order itself, asserting it violated his right to free speech in contravention of the First Amendment of the United States Constitution and his right to peaceably assembly under section three of the Kansas Constitution Bill of Rights. He contends the provision of the order that addresses communication with the protected person is facially overbroad because it prohibits communication that merely causes "annoyance or alarm" rather than that which creates a "reasonable fear of physical harm."

As Livengood notes, this court previously allowed an offender to collaterally attack a protective order on First Amendment grounds within the direct appeal from their conviction for violating that order. See *State v. Smith*, 57 Kan. App. 2d 312, 317, 452 P.3d 382 (2019). Generally, issues not raised before the trial court—including constitutional grounds for reversal—cannot be raised for the first time on appeal. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018); *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). But there are several exceptions, including the following: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the district court was right for the wrong reason. *State v. Johnson*, 309 Kan. 992, 995, 331 P.3d 1036 (2019). Livengood attempts to secure review through application of the first two exceptions.

Supreme Court Rule 6.02(a)(5) (2022 Kan. S. Ct. R. at 35) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal. *Johnson*, 309 Kan. at 995. In *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014), and *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015), the

24

Kansas Supreme Court warned that Supreme Court Rule 6.02(a)(5) would be strictly enforced, and litigants who skirted this rule risked a ruling that the issue is improperly briefed, and the issue will be deemed waived or abandoned. See *Daniel*, 307 Kan. at 430.

But even when an exception may allow for review of an issue for the first time on appeal, our Supreme Court has considered and rejected a mandatory application of the exception in *State v. Gray*, 311 Kan. 164, 459 P.3d 165 (2020). The *Gray* court established that application of exceptions is discretionary: "The decision to review an unpreserved claim under an exception is a prudential one. Even if an exception would support a decision to review a new claim, we have no obligation to do so. [Citations omitted.]" 311 Kan. at 170.

In addition, both parties overlook an important detail of *Smith*, which is that the defendant in that case had challenged the constitutionality of the protective order from the outset of the criminal prosecution for violating the order. The district court rejected this argument twice, first when denying a pretrial motion to dismiss and then again when Smith renewed the claim at a bench trial on stipulated facts. *Smith*, 57 Kan. App. 2d at 314. Thus, the only procedural question before this court on appeal was whether Smith could collaterally attack the protective order in the criminal case, not whether the issue was preserved. 57 Kan. App. 2d at 316-17.

We decline to follow the *Smith* panel's lead because Livengood failed to attack the validity of the protective order at any point below. Moreover, the exception for consideration of an issue that may be necessary to serve the ends of justice or prevent the denial of a fundamental right does not seem to apply because even though Livengood mentions his right to peaceably assemble, he makes no meaningful attempt in his brief to challenge the provisions that seem to implicate that right. Rather, he merely mentions the language prohibiting him from communication that "would be likely to cause annoyance or alarm the protected person(s)." In other words, even if he is correct that this provision

25

is unconstitutionally overbroad, that would not be finally determinative of the case because he was found guilty of violating other provisions of the order that did not implicate his free speech rights. At the very least, Livengood has failed to properly brief this claim by not fully arguing it. As a result, we decline to reach the merits of Livengood's constitutional challenge to the protective order.

## DOES CUMULATIVE ERROR REQUIRE REVERSAL OF THE CONVICTION?

Livengood contends cumulative error compromised his right to a fair trial. We exercise de novo review over such claims. *State v. Ross*, 310 Kan. 216, 227, 445 P.3d 726 (2019). If there is no error or only a single error is detected, there is no error to accumulate and therefore no basis upon which to reverse a conviction. See *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018); *State v. Haberlein*, 296 Kan. 195, 212, 290 P.3d 640 (2012).

Livengood asserts that "when you combine the denial of the Bill of Particulars with the confusion surrounding [the] 'winky face' evidence, [the] innocuous nature of the contact, the multiple acts, the confusing and vague nature of the order, and the lack of any definitions related to the order" it highlights cumulative error that requires reversal of his conviction. But Livengood makes no attempt to explain how these potential errors, when considered collectively, denied him a fair trial. *State v. Hirsh*, 310 Kan. 321, 345-46, 446 P.3d 472 (2019) (appellate court considers errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence).

Moreover, as explained during each of the preceding arguments, Livengood failed to establish the trial court erred on any of these issues. As a result, we reject his cumulative error argument and affirm his conviction for violating a protective order.

## DID THE TRIAL COURT ABUSE ITS DISCRETION AT SENTENCING?

Lastly, Livengood argues the trial court abused its discretion by sentencing him to 12 months in jail rather than granting probation because the facts of his case did not warrant a jail term. According to Livengood, sending "a man confined to a wheelchair" to jail for a year for stating, "'I love you' and 'I am proud of you'" is an abuse of discretion because "this sentence surely shocks the conscience and requires at least a remand for further findings."

"'A criminal sentence that is within statutory limits will not be disturbed on appeal absent a showing of abuse of discretion or vindictiveness on the part of the sentencing court.'" *State v. Brown*, 309 Kan. 369, 375, 435 P.3d 546 (2019). An abuse of discretion occurs if the judicial action is:  (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Ingham*, 308 Kan. at 1469. In other words, "[j]udicial discretion is abused when no reasonable person would have taken the position taken by the trial court." *State v. Gumfory*, 281 Kan. 1168, 1170, 135 P.3d 1191 (2006). Livengood, as the party asserting that the trial court abused its discretion, bears the burden of showing such an abuse of discretion occurred. *Thomas*, 307 Kan. at 739.

As support for his contention that the trial court abused its discretion, Livengood references K.S.A. 2020 Supp. 21-6705(b), which contains a list of factors for a sentencing court to consider when fixing a minimum term of imprisonment. But as the State points out, that particular statute does not apply to crimes committed on or after July 1, 1993, so it bears no relevance on this case. K.S.A. 2020 Supp. 21-6705(c).

Moreover, Livengood does not allege that the trial court's sentence was vindictive. Rather, he suggests that the sentence "surely shocks the conscience" because he was currently confined to a wheelchair and it penalized him for expressing his emotions toward T.D. He fails to support this argument with any pertinent authority or show why it

27

is sound despite a lack of supporting authority. This is akin to failing to adequately brief the issue. See *State v. Pewenofkit*, 307 Kan. 730, 731, 415 P.3d 398 (2018).

We are unable to find that the sentencing court abused its discretion. It sentenced Livengood to 12 months in jail for his conviction of violating a protective order, a class A person misdemeanor that carries a maximum jail sentence which "shall not exceed one year." K.S.A. 2018 Supp. 21-5924(a)(6), (b)(1); K.S.A. 2018 Supp. 21-6602(a)(1). Thus, the sentence at issue fell squarely within the statutory limits and cannot be considered unreasonable given Livengood's criminal history—which, as the court noted at sentencing, contained several convictions of a similar nature. A reasonable person could agree with the trial court's decision.

Affirmed.